NATIONAL BANK OF COMMERCE (of El Dorado, Arkansas), Guardian of the Estate (Only) of James Talley, a Minor, and Shirley Talley Collins and George Talley, Parents *v.* HCA HEALTH SERVICES OF MIDWEST, INC. d/b/a Doctors Hospital, Hospital Corporation of America, Frances Tully, and Brenda Swayze

89-283                                                    800 S.W.2d 694

Supreme Court of Arkansas
Opinion delivered December 3, 1990
[Rehearing denied January 14, 1991.*]]

---

*Newbern, Corbin, and Brown, JJ., not participating.

*Whetstone and Whetstone*, by: *Bernard Whetstone, Bud Whetstone*, and *Bob Davidson*, for appellants.

*Friday, Eldredge & Clark*, by: *William H. Sutton, Donald H. Bacon*, and *Laura Hensley Smith*, for appellees.

W. DENT GITCHEL, Special Justice. James Talley was born in Doctors Hospital on September 7, 1982. He appeared to be a normal, healthy baby. Several hours later, shortly after midnight,

nurse Frances Tully discovered that James had stopped breathing and had no heartbeat. He was immediately resuscitated, but showed symptoms of brain damage. James' parents and the guardian of his estate sued HCA Health Services of Midwest, Inc., d/b/a Doctors Hospital (Midwest) and the three nurses who were on duty in the nursery at the time of the incident.

When the case was first tried in 1986, the jury returned a verdict against Midwest, awarding both compensatory and punitive damages. This court reversed and remanded. *HCA Health Serv. of Midwest, Inc.* v. *National Bank of Commerce*, 294 Ark. 525, 745 S.W.2d 120 (1988). The second trial, from which this appeal comes, resulted in a verdict in favor of the defendants. Appellants raise a number of points for reversal. However, we find none of them persuasive and affirm.

1.  *Absence of the mattress.*

■   Appellants assert that "appellees unwarrantedly failed to produce at the trial the mattress on which James Talley was lying at the time of the occurrence." The "mattress" in question is a plastic-covered, foam rubber bassinet pad about an inch thick. Appellees had introduced the mattress at the first trial, asserting that it was *the actual* mattress. Appellants objected to its authenticity, contending that the actual mattress was thicker and fluffier. The mattress was filed with the record on the first appeal to this court and was misplaced by the clerk. While preparing for the second trial, appellees attempted to obtain the mattress from the clerk, but were informed that it was lost. Appellants did not attempt to locate the mattress, but the clerk found it after the second trial. Appellants suffered no prejudice from the absence of the appellees' exhibit, the admissibility of which they had steadfastly contested.

2.  *Summary judgment in favor of Hospital Corporation of America.*

Midwest is a wholly owned subsidiary of Health Services Acquisition Corp.; Health Services Acquisition Corp. is a wholly owned subsidiary of HCA, Inc.; and HCA, Inc. is a wholly owned subsidiary of Hospital Corporation of America (Hospital Corporation), a publicly owned corporation. Of these corporations, only Midwest was a party at the time of the first trial.

One basis for this court's reversal on the first appeal was plaintiffs' counsel's references to Hospital Corporation, a non-party, when discussing punitive damages during opening statement and closing argument. On remand, the appellants joined Hospital Corporation as a defendant, and the trial court entered summary judgment in favor of Hospital Corporation. The trial court erred, but the jury's verdict in favor of the appellees rendered the error harmless.

In essence, the appellants' theory of liability was that James Talley's injuries were proximately caused by the nurses leaving him unattended, that the inattention resulted from understaffing in the nursery, that hospital personnel had complained to the manager about the understaffing, and that the manager had failed or refused to provide more nurses. Appellants argue that the manager's allegedly wrongful acts should be imputed not only to Midwest, but also to Hospital Corporation. Appellees argue that no relationship existed between Hospital Corporation and either Midwest or the hospital manager.

Appellants made no allegation, proffered no evidence, and presented no affidavit to the trial court indicating that Hospital Corporation was itself guilty of wrongful conduct. In their briefs and argument the appellants make bare, unsupported statements that Hospital Corporation ordered the manager to cut the nursing staff, but the record contains nothing to support these statements. Although a principal or master may be liable for its own tortious conduct, *see* RESTATEMENT (SECOND) OF AGENCY § 212 (1958), some factual support for the assertion is necessary. In the absence of any such factual support, summary judgment on the issue of Hospital Corporation's own conduct was proper.

■■ A principal or master may also be vicariously liable for the tortious acts of its agent or servant within the scope of the agency or employment. *See Gleason v. Seaboard Air Line Ry.*, 278 U.S. 349 (1929); *Dillard Dept. Stores, Inc. v. Stuckey*, 256 Ark. 881, 511 S.W.2d 154 (1974). The record does contain sufficient evidence to raise a genuine question of fact whether a principal-agent or master-servant relationship existed between Hospital Corporation and the manager of Doctors Hospital. This question of fact should have been left for the jury to decide. *See B. J. McAdams, Inc. v. Best Refrigerated Exp., Inc.*, 265 Ark. 519,

579 S.W.2d 608 (1979); *Fireman's Fund Ins. Co. v. Leftwich*, 192 Ark. 159, 90 S.W.2d 497 (1936). However, the court's error in granting summary judgment was rendered harmless by the jury's verdict in favor of appellees. Where the issue of liability is decided in favor of the agent or servant and against the plaintiff, as it was here, the principal or master cannot be vicariously liable. *See New Orleans & N.E. R.R. v. Jopes*, 142 U.S. 18 (1891).

Appellants argue two other theories under which they assert that Hospital Corporation could have been held liable, neither of which has merit. First is joint venture. Joint venturers may be held jointly and severally liable for one another's wrongful acts, *Myers v. Lillard*, 215 Ark. 355, 220 S.W.2d 608 (1949), but a joint venture must have the elements of a partnership. *State ex rel. Attorney General v. Gus Blass Co.*, 193 Ark. 1159, 1055 S.W.2d 853 (1937). Hospital Corporation and Midwest were not joint venturers because their relationship did not have the elements of a partnership. Even if they had been joint venturers, the jury's verdict in favor of Midwest also exonerated Hospital Corporation because liability of a joint venturer is vicarious, founded on principles of agency. *See Franko v. Bunyard*, 261 Ark. 144, 547 S.W.2d 91 (1977); *Vrabel v. Acri*, 156 Ohio St. 467, 103 N.E.2d 564 (1952). Appellants' other theory is "piercing the corporate veil." One who seeks to disregard the corporate entity must show that the corporate form has been abused to the injury of a third person. *Rounds & Porter Lbr. Co. v. Burns*, 216 Ark. 288, 225 S.W.2d 1 (1949). There is no evidence to support this theory.

3. *The trial court's handling of prospective juror Wheetley.*

During voir dire, appellant's counsel was allowed to ask the following question over objection:

> Do any of you have a feeling that you would not be able to award as much as ten million dollars or in that neighborhood under any circumstances, no matter what the proof has shown, no matter what the process of law is, does anybody have any hesitation about awarding as much as ten million dollars if you thought the evidence justified? This may be the most important question that I will ask you and I would like to ask you the question individually. . . .

An objection to individual questioning was overruled, and appellants' counsel examined each prospective juror. The following transpired:

Q:   Mrs. Linda Wheetley, would you have any hesitation in awarding ten million dollars if you felt it was justified under the evidence and the instructions of the court?

A:   As I told you previously, I was on the Guthrie-Alcoa case and this one to me is very similar and I still have the opinion and judgment from that case and that was a large sum of money, and I don't really think I am going into this case with a clear mind.

. . . .

Appellants' counsel next attempted to inquire into Mrs. Wheetley's deliberations in the other case, but an objection was sustained. Then the following transpired:

A:   From previous experience I do have feelings that are different now.

Q.   Translating that into my question now, and the answer to my question about the ten million dollars, would you have any hesitation about giving as much as ten million dollars if you thought the evidence justified it?

A:   I sure would.

Counsel then approached the bench and moved that the juror be struck for cause. The court then asked:

Q:   Ms. Wheetley, if you're chosen as a juror in this case, can you lay aside everything, I'm not talking about laying aside your common sense because you have a right and you should exercise that, but can you lay aside everything besides the case and the exercise of your common sense based on the evidence and based on the law and return the verdict that is appropriate whether it be for the defendant, or whether it be for the plaintiff and if the verdict be for the plaintiff return the amount of compensation that you feel is justified under the evidence and the law that you have heard? Can you do that? Forget about the figure of ten million dollars Mr. Whetstone asked you and I'll just ask

you can you do that?

A:  Yes.

The motion to strike for cause was denied, and the appellants used a peremptory challenge to strike Mrs. Wheetley.

■ Appellants argue that the trial court's instruction to Mrs. Wheetley to "forget about the figure of ten million dollars Mr. Whetstone asked you. . ." was disparaging, belittling and prejudicial. However, appellants made no objection. It has long been the rule in this state that an objection must be made to the trial judge's conduct before the issue may be considered on appeal. *Life & Cas. Ins. Co.* v. *Gilkey*, 255 Ark. 1060, 505 S.W.2d 200 (1974). *See also Smith* v. *Perkins*, 246 Ark. 427, 439 S.W.2d 275 (1969).

■ Appellants also argue that the trial court erred in refusing to strike Mrs. Wheetley for cause. They contend that they wanted to use their peremptory challenges to strike three other jurors and argue that the necessity of using a peremptory challenge to strike Mrs. Wheetley forced them to leave one objectionable juror on the panel. None of the three other jurors were challenged for cause. We affirm on this point because there is no proof in the record to substantiate the appellants' assertion of prejudice. In *Rickett* v. *Hayes*, 256 Ark. 893, 511 S.W.2d 187 (1974), this court held:

> We need not decide whether the circuit judge abused his discretion in this instance. The questioned juror did not sit on the jury. It has been a long-standing rule in this state that a party is not entitled to claim prejudice in such circumstances unless it is shown that he was forced to accept some objectionable or disqualified juror without the privilege of exercising a peremptory challenge. *Arkansas State Highway Comm'n* v. *Dalrymple*, 252 Ark. 771, 480 S.W.2d 955. No juror who was challenged for cause served on the jury and it is not shown that appellant would have otherwise struck the name of some juror other than the three actually stricken.

We find *Rickett* to be determinative in this case.

### 4. *The incident with the jury foreman.*

Shortly after the jury retired to deliberate, the jury foreman suddenly walked into the room where the trial judge and counsel for both parties were sitting. The record's only reference to this incident appears in the trial court's order denying the appellants' motion for new trial. According to the order:

> 4. Within a few minutes after retiring in the present case the jury foreman came to the trial judge, and in the presence of all attorneys, stated some of the jurors wanted a definition of the word "occurrence." The foreman inquired if it meant only the "seizure or what."
>
> 5. The Court stated no further explanation could be given by the Court; gave the jury foreman the written instructions; and told the foreman that the jury should resolve that question from all evidence received and the law as contained in the instructions.

The word "occurrence" appeared in interrogatories proposed by the appellants and submitted to the jury over the appellees' objection. No party objected to the court's manner of handling the incident with the jury foreman.

The procedure to be followed in civil cases when the jury desires further instruction during deliberation is governed by Ark. Code Ann. § 16-64-115 (1987), which states:

> After the jury has retired for deliberation, if there is a disagreement between them as to any part of the testimony, or if they desire to be informed as to any point of law arising in the case, they may request the officer to conduct them into court, where the information required shall be given in the presence of, or after notice to, the parties or their counsel.

An almost identical statute, Ark. Code Ann. § 16-89-125(e) (1987), governing the procedure in criminal cases, has been construed many times. In every case decided under the criminal statute the court communicated significant information to the jury without complying with the statute. In *Andrews v. State*, 251 Ark. 279, 472 S.W.2d 86 (1979), this court held that strict compliance with the criminal statute is mandatory.

■ In *Andrews*, this court discussed the dangers inherent in the court's conversing with one juror after deliberations have begun:

> [W]here answers are given to only one member of the jury, and he in turn reports that answer to the other jurors, there is a great opportunity for misconstruction. After all, the juror is not a lawyer and, though honestly and conscientiously endeavoring to convey to the other jurors the answer of the court, will necessarily only give his interpretation of what was said; this interpretation may be erroneous. Of course, it is also possible that the single juror might not ·hear correctly everything the court said.

These dangers are, of course, equally present in a civil case, and we hold that compliance with the civil statute is also mandatory. Prejudice is presumed from a violation unless we can say with confidence that lack of prejudice is manifest. We find that lack of prejudice is manifest in the present case.

Section 16-64-115 commands that *the information required* be given to the entire jury in the presence of, or after notice to, the parties or their counsel. The statute prescribes the method of communicating *the information required*, not necessarily the *information requested*. Before additional information is given, the trial court must determine whether the *information requested* is *required*. The trial court has broad discretion to decide what information should be given to the jury. *Dickerson Constr. Co., Inc. v. Dozier*, 266 Ark. 345, 584 S.W.2d 36 (1979); *Rose* v. *King*, 170 Ark. 209, 279 S.W. 373 ·(1926); *Dodwell* v. *Mound City Sawmill Co.*, 90 Ark. 287, 119 S.W. 262 (1909). If the trial court decides that further information is *required*, Section 16-64-115 governs the method of communicating that information to the jury.

■ In the present case, the trial court determined that no information was required and so informed the foreman. No information was given. The only violation of the statute was in the foreman's requesting clarification himself rather than sending the deputy to convey the request. The appellants could have requested that the jury be brought in for further instructions, but did not. The appellants could have objected to the court's method of handling the incident, but, again, did not.

The statute governing further instructions to the jury in civil cases, Section 16-64-115, was discussed in *Dickerson Constr. Co., Inc.* v. *Dozier, supra.* In *Dickerson* the jury sent the deputy to request that it be furnished a damages chart used by the appellee in closing argument. The chart had not been introduced into evidence. The trial judge and appellant's counsel were not present. Appellee's counsel gave the chart to the deputy, who took it to the jury. As soon as he learned of the incident, appellant's counsel moved for a mistrial. This court reversed because "appellant had no opportunity to object or to ask the court to give the jury a cautionary instruction." Appellants in the present case had both of those opportunities. Accordingly, in these circumstances, we find that there was no prejudicial error. *See also Stull* v. *Ragsdale*, 223 Ark. 277, 620 S.W.2d 264 (1981).

### 5. *Alleged jury confusion.*

Appellants allege that the verdict was the obvious result of jury confusion over the meaning of the word "occurrence." The allegedly confusing word appeared only in interrogatories proposed by the appellants and objected to by the appellees. When the incident with the jury foreman occurred, the appellants did not request that the jury be further instructed. Nor did the appellants ask that the jury be polled after it returned its verdict or question the verdict before the jury was discharged.

The sanctity of jury deliberations is a fundamental precept of our adversary system. The public interest in preserving the confidentiality of jury deliberations is embodied in an evidentiary rule making jurors incompetent to:

> testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, nor may his or any other juror's affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received. . . .

A.R.E. 606(b).

The evidence rule includes an exception applicable when a

question is raised as to whether extraneous prejudicial information was improperly brought to the jury's attention or whether outside influence was improperly brought to bear upon any juror, but no such question is raised here.

■ This court has held that "as a general rule, the failure to object to some irregularity in a verdict prior to the discharge of the jury constitutes a waiver of that irregularity." *Coran* v. *Keller*, 295 Ark. 308, 748 S.W.2d 349 (1988). Since no timely objection was made by the appellants, we affirm on this point.

## 6. *The quality-care committee privilege.*

Arkansas, like virtually every other state, has created a medical quality-care committee privilege. Ark. Code Ann. § 16-46-105 (1987). The statute provides:

> (a)  The proceedings, minutes, records, or reports of organized committees of hospital medical staffs or medical review committees of local medical societies having the responsibility for reviewing and evaluating the quality of medical or hospital care, and any records compiled or accumulated by the administrative staff of such hospitals in connection with such review or evaluation, together with all communications or reports originating in such committees, shall not be subject to discovery or admissible in any legal proceeding and shall be absolutely privileged communications. Neither shall testimony as to events occurring during the activities of such committees be admissible.
>
> (b)  Nothing in this section shall be construed to prevent disclosure of the data mentioned in subsection (a) to appropriate state or federal regulatory agencies which by statute or regulation are entitled to access to such data, nor to prevent discovery and admissibility if the legal action in which such data is sought is brought by a medical practitioner who has been subjected to censure or disciplinary action by such committee.
>
> (c)  Nothing in this section . . . shall be construed to apply to original hospital medical records, incident reports, or other records kept with respect to any patient in the course of business of operating a hospital or to affect the discoverability or admissibility of such records.

■ Appellants allege that the quality-care committee privilege created by Section 16-46-105(a) was applied too broadly by the trial court and that, as applied by the trial court, the privilege violates Ark. Const. art. II. § 13. We hold that the trial court did not err in its application of the privilege. Therefore, we do not reach the appellants' constitutional argument.

At the first trial of this case, the appellants were allowed to introduce the records of a post-incident disciplinary proceeding against one of the nurses. Appellants contended that the records were admissible under subsection (c) of the privilege statute. This court reversed, holding that the records were within the privilege described in subsection (a). *HCA Health Serv. of Midwest, Inc.* v. *National Bank of Commerce*, 294 Ark. 525, 745 S.W.2d 120 (1988).

At the trial on remand, the appellees took the position that virtually everything any physician or hospital employee did or said at any time was protected by the privilege. The appellants argue that the trial court agreed with the appellees' overbroad application of the privilege. However, the record does not support the appellants' argument. For example, the treating physician, who was a member of the hospital's pediatric committee, was allowed to testify over the appellees' objection to his conversations with the manager and other hospital employees about the shortage of nurses.

The appellants also contend that they were not allowed to cross-examine the hospital manager about conversations concerning a nursing shortage. The record reflects that the court overruled the appellees' objection to that line of cross-examination. Appellants' counsel then asked a question that confused the witness and when the court instructed counsel to restate the question, counsel instead withdrew the question and proceeded to another line of inquiry.

The appellants further contend that error occurred when they were not allowed to use some blown-up charts during their questioning of one of the nurses. The charts contained prior statements of the witness, some of which the trial court found should be excluded by the privilege. The court required that the charts be redone to omit the privileged statements. No proffer was made and there is nothing in the record to indicate that the court

erred. Failure to make an offer of proof precludes review of this issue on appeal. *See* A.R.E. 103(a)(2).

The appellants also argue that the court erred in directing their hospital safety expert not to base any of his opinions on facts he had learned from examining quality-care committee records. The expert told the court he had no intention of doing so. This was not error.

■ Additionally, the appellants allege error in the exclusion of the deposition of another physician who had been a member of the pediatric committee. A portion of the deposition had been introduced at the first trial. In the deposition the physician had related his conversations with the hospital manager about the shortage of nurses. The court excluded this deposition in its entirety on the ground that it related almost entirely to committee proceedings. Appellants made no proffer of the deposition. A.R.E. 103(a)(2) requires an offer of proof before alleged error in excluding evidence may be considered on appeal. Without the deposition, this court cannot question the rectitude of the trial court's decision.

## 7. *Misconduct of counsel.*

■ Appellants assert that appellees' counsel was guilty of misconduct. They assert that appellees' counsel argued during opening statement, made improper closing argument, made frivolous objections, asked leading questions, moved repeatedly for mistrial, asked a question calculated to make a witness break down, improperly referred to the former trial, and used "a tone of voice carrying the clear message that he feels the Deity is on his side. . . ." We agree with the trial court's finding, in its order denying appellants' motion for new trial, that "the conduct of the attorneys in this case, while spirited and persistent, did not constitute misconduct."

In support of their argument, the appellants rely on *Alexander* v. *Chapman*, 289 Ark. 238, 711 S.W.2d 765 (1986). In *Alexander*, this court reversed and remanded because that case presented "the unique situation where counsel was repeatedly admonished and the court repeatedly sustained objections to the leading questions, was even presented with a motion to strike the testimony, yet counsel's conduct was not stopped." We empha-

sized that "our decision is necessarily limited to the facts this record presents. . . . The question on appeal is whether the trial court abused its discretion. . . . We do not, as a matter of course, reverse on the basis of such allegations even if they are borne out by the record."

The record in the present case does not reveal the kind of flagrant violations of the trial court's rulings that were present in *Alexander*. We will briefly discuss each of the appellants' assertions of misconduct.

Both the appellants and the appellees objected during opening statements and closing arguments; the trial court properly instructed the jury that statements and arguments of counsel were not evidence and should be disregarded if not supported by the evidence. Both the appellants and the appellees made frequent objections throughout the trial; their objections were made in good faith and were not frivolous. Counsel for appellees did not engage in excessive leading questions and did not ignore the trial court's rulings when it sustained the appellants' occasional objections to leading. Appellants cite six instances where the appellees moved for a mistrial; each motion was made out of the hearing of the jury, and no prejudice resulted.

The witness who broke down was a nurse called as an adverse witness by the appellants. After the appellants' lengthy examination, the first question asked by appellees' counsel was: "[W]hen you and I met the first time, I believe you had returned after some leave [of] absence due to a very tragic loss of your own. Is that correct?" The witness said, "yes." Appellees' counsel then began inquiring about the nursery room. After two questions, the witness requested time to compose herself. Nothing in the record supports the argument that the witness's loss of composure was deliberately caused by appellees' counsel.

The appellees, of course, wanted to prevent any reference to the first trial because it had resulted in a large verdict for the appellants. The appellants had made a motion *in limine* for permission to refer to the first trial, with an instruction to the jury that it should not influence their deliberations. The court forbade all reference to the first trial. Appellees' counsel, while reading into evidence excerpts from the deposition of one of the appellants' expert witnesses, read an answer that included the lan-

guage, "I probably billed him around. . .four thousand dollars for everything that I did up to and including the trial in 1986." No objection was made. After the appellees rested, appellants requested permission to mention the first trial in closing argument because of alleged prejudice aroused by the deposition reference to the first trial. The court denied the request, holding that there was no substantial prejudice to appellants and that further mention would only emphasize the matter. The court did not abuse its discretion.

"A tone of voice carrying the clear message that he feels the Deity is on his side. . ." is a characteristic every trial lawyer seeks to acquire. Whether a lawyer adopts the stentorian manner of Daniel Webster, the quiet reason of Abraham Lincoln, or the bombastic passion of Billy Sunday, the goal is the same: to persuade the jury that his side's theory of the case enjoys the imprimatur of justice, truth and right. The lawyer who achieves this pinnacle of credibility should be praised, not censured.

8. *Costs.*

▆▆ Appellants request that this court award them $3,404.60 costs for additional parts of the record unnecessarily designated by the appellees. The appellants submitted an itemized list of parts of the record for which they assert the appellees should be responsible. Many of these items were pretrial matters and were outside the scope of the appellees' supplemental designation of record. The remainder consisted of the transcript of testimony of trial witnesses. The appellants raised broad, general issues on appeal, particularly with regard to the alleged misconduct of appellees' counsel. To effectively respond to such allegations, the appellees reasonably considered it necessary to have the transcript of the testimony of all trial witnesses. We cannot say in hindsight that the additional portions of the record designated by the appellees were unnecessary to the consideration of the issues. Accordingly, the appellants' motion to retax costs is denied.

Affirmed.

Special Justices JERRY CAVANEAU and A. D. MCALLISTER join in this opinion.

NEWBERN, TURNER, and PRICE, JJ., not participating.