FARM CREDIT BANK of St. Louis *v.*
Bob MILLER and Karon Miller

93-652                                              872 S.W.2d 376

Supreme Court of Arkansas
Opinion delivered March 21, 1994
[Rehearing denied April 25, 1994.*]

*Corbin, J., not participating.

*Friday, Eldredge & Clark*, by: *Richard D. Taylor*, for appellant.

*David Hodges* and *Bay Fitzhugh*, for appellees.

ROBERT H. DUDLEY, Justice. Appellees Bob and Karon Miller, a real estate agent and a real estate broker who own Miller Realty in Bald Knob, filed suit against the Farm Credit Bank of St. Louis. They pleaded that they had a real estate sales agreement with Farm Credit and were entitled to receive a commission for the sale of a tract of land owned by Farm Credit. They alleged that Farm Credit refused to pay the agreed commission and asked damages for tortious interference with contractual relations and breach of contract. The trial court directed a verdict against the Millers on the tort claim, but let the contract claim go to the jury. The jury found that the Millers were the procuring cause of the sale and returned a verdict for them in the amount of $88,000. Farm Credit files a direct appeal, and the Millers file an alternative cross-appeal. We affirm on direct appeal and do not reach the alternative cross-appeal.

Appellant Farm Credit first argues that there was no substantial evidence to support the verdict. The facts, viewed most favorably to appellee Millers, as we must do, are as follows. Farm Credit owned a 3,700 acre farm in Woodruff County that was known as the Little Dixie Farm. In late 1988, the Millers asked Farm Credit employee Jack Runsick about listing the farm for sale. As a result, they obtained a nonexclusive contract, under which they were to receive four percent of the sale price as their commission if the property was sold to a prospect the Millers had listed with Farm Credit. On December 12, 1988, the Millers confirmed the agreement by letter and registered twenty-three prospects, including the United States Fish and Wildlife Service. The Millers also testified that they later mailed to Farm Credit a photocopy of the December 12 letter with the handwritten notation that the Nature Conservancy was to be added as a registered prospect.

The Millers often corresponded with the federal agency in order to pique its interest. They sent brochures, made aerial photographs showing the suitability of the tract for wildlife, advised the agency of the flood plain, and kept the agency advised of potential buyers. The Millers made fifty to sixty telephone calls to the agency and Farm Credit. Their contact with the agency was through John Yount of its Atlanta, Georgia, office. Yount testified

that after receiving the informational packets and aerial photographs, the agency determined that it had a real interest in the tract because it was within the ten-year flood plain and was within the acquisitional boundary of the Cache River National Wildlife Refuge. The agency subsequently classified the tract as a priority purchase and obtained authority to acquire the property.

The agency did not have an appropriation for the purchase of the land that fiscal year. A plan was devised by which Nature Conservancy, a private organization that acquires land for wildlife refuges, would purchase the farm and hold it until the agency could purchase it. Yount and Nancy Delamar of Nature Conservancy both testified that the two organizations had an ongoing and cooperative relationship through which Nature Conservancy bought land and held it until the agency was able to purchase it.

Tom Norsworthy replaced Jack Runsick as Farm Credit's local employee, and on March 7, 1989, Yount contacted Norsworthy for permission to appraise the property. Norsworthy gave Yount approval for the appraisal on March 10, 1989.

Meanwhile, on February 7, 1989, Miller Realty had written E. M. Radcliffe about duck hunting properties and mentioned that the federal agency was in the process of acquiring the farm. Soon thereafter, in March 1989, Tim Streeter, an associate of Radcliffe, and Gordon Brent met with Jim Miller, an agent of Miller Realty, and discussed the agency's interest in acquiring the land. Gordon Brent corresponded with the federal agency about its desire to purchase the land. Streeter and Brent knew that the agency wanted the land and formed a corporation, Little Dixie Planting Company, for the purpose of purchasing the farm. A jury could fairly infer that Little Dixie Planting was formed for the purpose of reselling the land to the federal agency. In April 1989, Little Dixie Planting signed a contract with Farm Credit to purchase the farm for 2.2 million dollars. Little Dixie Planting had only one asset, a $100,000 certificate of deposit that had been in the name of Gordon Brent. Its officers cashed the certificate and paid $100,000 to Farm Credit upon signing the agreement. The remainder was to be paid at closing.

It was at about this same time that the federal agency asked Nature Conservancy to acquire the land. Nature Conservancy

contacted Tim Streeter and sought an assignment of Little Dixie Planting's contract. Streeter contacted Farm Credit to see if he could assign the contract to Nature Conservancy. Farm Credit advised Streeter that it would not authorize an assignment of the contract from Little Dixie Planting to Nature Conservancy.

The closing of the sale took place on August 15, 1989. At that time, Nature Conservancy advanced $2,346,000 to Streeter and Little Dixie Planting. Farm Credit deeded the land to Little Dixie Planting for $2,200,000, and Little Dixie Planting, in turn, deeded the land to Nature Conservancy for the $2,346,000. The federal agency was to buy the land from Farm Credit as "migratory bird money" became available. On October 10, 1991, Nature Conservancy conveyed 1,152.96 acres of the tract to the federal agency for $663,000 and on January 31, conveyed all but 300 of the remaining acres to the federal agency for $1,019,363.

██ Arkansas, along with the majority of jurisdictions, has long adhered to the procuring cause doctrine to determine whether a real estate broker is entitled to a commission. *See Hodges* v. *Bayley*, 102 Ark. 200, 143 S.W. 92 (1912); see also Luther Zeigler, *Brokers and Their Commissions*, 14 Real Est. L. J. 122, 123 (1985). This doctrine can be used affirmatively to infer a contract between the broker and the principal by allowing the broker to show that his part of the contract was performed and the principal reaped a benefit, or defensively to prevent broker fraud. *See* D. Barlow Burke, Jr., *Law of Real Estate Brokers* § 3.4 at 3:50, 3:54 (2d ed. 1992). It functions as a parol or extrinsic evidence rule to allow courts to look past the four corners of the listing agreement, and recovery under the doctrine is not dependent upon the express terms of the contract. Burke, *supra,* § 3.4 at 3:63; *see also Hopper* v. *Denham*, 281 Ark. 84, 663 S.W.2d 379 (1983); *Hodges*, 102 Ark. at 203, 143 S.W. at 93.

██ In determining whether a broker is entitled to a commission, this court has said that the determination is highly fact-dependent, and the court looks at the whole context of the relevant transactions. *Schnitt* v. *McKellar*, 244 Ark. 377, 427 S.W.2d 202 (1968). We have long recognized that a broker is not allowed to recover a commission when he merely performs one event in a chain of actions. He must be a proximate cause of the eventual sale rather than a mere incidental link, and the sale must be a

result of his continuous course of conduct. *Hatchett* v. *Story*, 221 Ark. 120, 252 S.W.2d 78 (1952). However, he need not perform the actual sale to be due his commission; if this continuous course of conduct is demonstrated, he may still receive his commission even if he is excluded from the final transaction. *Hopper*, 281 Ark. at 87, 661 S.W.2d at 381; see also Barrett v. Land Mart of America, 3 Ark. App. 70, 621 S.W.2d 889 (1981); Storey v. Johnson, 270 Ark. 392, 605 S.W.2d 480 (Ark. App. 1980). Arkansas courts have found that a broker is due a commission if it appears that a sale to a third party is a straw transaction designed to avoid paying it. *See McKay & Co.* v. *Garland*, 17 Ark. App. 1, 701 S.W.2d 392 (1986).

■ The test is whether the Millers were the procuring, or efficient, cause of the sale to the federal agency. The Louisiana Court of Appeals set out factors that are helpful in this regard. In *Farnsworth Samuel, Ltd.* v. *Grant*, it wrote:

> Some of the [factors which determine whether a broker procured a sale are]: whether the prospect who ultimately purchased the property knew about the property before being contacted by the broker; the relative success or failure of the negotiations conducted by the broker, including the continuity or discontinuity of the original and final negotiations, the length of time elapsing between the broker's negotiations and the final sales agreement, and the development of a new, independent motive for prospect to purchase; whether or not the broker abandoned efforts to negotiate the transaction with a particular prospect; and, finally, the good or bad faith of the principal and the broker.

470 So. 2d 253, 254 (La. App. 1985). *See also* Lora C. Sykora, *The Law of Real Estate Brokerage Contracts: The Broker's Commission*, 14 La. L. Rev. 847 (1981). In this case there was testimony that the federal agency was not interested in purchasing the land until contacted by the Millers, and once the agency became interested, the Millers continually worked toward the sale and never abandoned those efforts.

■ Farm Credit's argument for reversal rests upon the express language of the listing agreement and the fact that the

Millers did not register Little Dixie Planting, but such an argument ignores the procuring cause doctrine. The Millers do not claim that they registered Little Dixie Planting. Rather they claim that they were the procuring cause of the entire transaction that resulted in the sale to the federal agency. *See Schnitt*, 244 Ark. at 385, 427 S.W.2d at 207. Showing a continuous course of conduct leading to the sale can mean that a broker is due a commission. *Hatchett*, 221 Ark. at 123, 252 S.W.2d at 79-80. A broker can be due a commission even if the first sale is to a third party, if it can be shown that the first sale is a straw transaction. *McKay & Co.*, 17 Ark. App. at 4, 701 S.W.2d at 394. There was substantial evidence that the Millers were the procuring cause of the federal agency's purchase of the land.

In a related argument, Farm Credit contends that the Millers' attorney, in closing argument, admitted the Millers did not register Little Dixie Planting and consequently there was not substantial evidence to support the verdict. Again, the argument is without merit because it ignores the procuring cause doctrine.

Farm Credit's final argument is that the trial court erred in refusing to answer an inquiry from the jury. The facts surrounding the argument are as follows. The jury was instructed about the procuring cause doctrine as follows: "You are instructed that Arkansas adheres to the general rule that a broker is entitled to his or her commission if he or she is the procuring cause of an eventual sale between the owner and purchaser." During deliberations, the jury foreman handed the bailiff a handwritten note requesting clarification. The note asked: "In the legal Instruction No. 6, the last part says 'an eventual sale concluded between owner and purchaser.' Is the *owner* interpreted to be the original owner or the owner at the time of the sale on the contract?" After a bench conference in which both parties stated their positions, the Court answered the inquiry by a note which said, "The Court is not permitted to respond to your inquiry."

Farm Credit contends that the trial court abused its discretion in refusing to answer. Section 16-64-115 of the Arkansas Code Annotated of 1987 allows a jury to request further instruction during deliberations by requesting the bailiff to conduct them into court. *Id.* Whether to give the additional information is a matter for the trial court's discretion. *National Bank of Com-*

*merce* v. *HCA*, 304 Ark. 55, 800 S.W.2d 694 (1990).

The trial court refused to answer the question because it would have been required to resort to speculation and conjecture to understand the exact question, and the jury's inquiry may have involved a question of fact about who should be considered the owner for the purpose of the procuring cause doctrine. The instruction was given without objection. The trial court's subsequent refusal to elaborate on the instruction under these circumstances did not amount to an abuse of discretion. There are no reversible errors on direct appeal, and, accordingly, we affirm.

The Millers filed a notice of cross-appeal and submitted briefs and arguments on cross-appeal, but made their arguments conditional on reversal of the direct appeal. The Millers state that their cross-appeal becomes moot if the case is affirmed on direct appeal. Since we affirm on direct appeal, we do not reach the conditional cross-appeal.

CORBIN, J., not participating.