# IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION AT JACKSON

AMBERJACK, LTD., INC.,  )
d/b/a NONCONNAH CORPORATE  )
CENTER,  )
                                   )
     Plaintiff/Appellant,  )     Shelby Law No. 53877 T.D.
                                   )
vs.  )
                                   )     Appeal No. 02A01-9512-CV-00281
FRED THOMPSON, Individually, and  )
d/b/a THOMPSON QUALITY  )
MANAGEMENT, INC. and THOMPSON)
QUALITY MANAGEMENT, INC.,  )
                                   )
     Defendants/Appellees  )

**FILED**

**October 7, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

## APPEAL FROM THE CIRCUIT COURT OF SHELBY COUNTY AT MEMPHIS, TENNESSEE

### THE HONORABLE JAMES E. SWEARENGEN, JUDGE

For the Plaintiff/Appellant:

Monique A. Nassar
Memphis, Tennessee

For the Defendant/Appellee, Fred Thompson:

Beth Brooks
Germantown, Tennessee

**REVERSED IN PART,
AFFIRMED IN PART
AND REMANDED**

HOLLY KIRBY LILLARD, J.

CONCUR:

ALAN E. HIGHERS, J.

DAVID R. FARMER, J.

**OPINION**

This lawsuit involves the breach of a lease agreement. The corporate lessee vacated the premises and stopped paying rent; consequently, the lessor filed suit. The trial court found the lessee in breach of the lease, but found the lease agreement unconscionable, held that the lessor failed to mitigate its damages, and held that the president of the corporate lessee could not be held personally liable. We affirm the trial court's finding of a breach, but reverse its remaining findings and award the lessor damages for the entire term of the lease.

In July 1991, Thompson Quality Management ("TQM") entered into an agreement to lease 900 square feet of commercial space from Nonconnah Corporate Center ("Nonconnah"). The lease agreement (the "Agreement") was executed by Fred Thompson ("Thompson"), the president of TQM. The lease was for a three-year period, beginning in August 1991 and running through July 1994. The original monthly rent was $1,005.00 but was periodically adjusted, pursuant to the Agreement. By the end of the rental period in 1994, the monthly rent had increased to $1,048.00. The Agreement provided further that TQM was liable for late charges of 10% on delinquent rental payments owed to Nonconnah. It also included a provision for the payment of Nonconnah's costs of collection and attorney's fees if Nonconnah was required to employ an attorney to enforce TQM's obligations under the Agreement. At the time the parties entered into the Agreement, TQM was licensed as an Arkansas corporation.

Soon after TQM entered into the Agreement, it began experiencing financial difficulties. Thompson notified Nonconnah that TQM would be unable to continue occupying such a large space. Evidence from the record indicates that TQM vacated the premises in June 1992, and began defaulting on its monthly lease payments beginning in August 1992.

The Agreement included a provision preventing TQM from assigning the lease or sub-leasing the premises without Nonconnah's prior written consent. The Agreement also provided that any modifications or amendments to the Agreement must be "reduced to writing and signed by [both parties]".

After TQM notified Nonconnah that it would be unable to continue occupying its space, Nonconnah's leasing agent, Stephen Sorrell, facilitated TQM's introduction to Mr. Leonard Alexander, a potential sub-tenant for TQM's space. Subsequently, Alexander sent a letter to Sorrell informing Nonconnah that he was negotiating with TQM to sub-lease its space, and requesting Nonconnah's assistance. Pursuant to Alexander's request, Sorrell conferred with Alexander.

Alexander later entered into a lease agreement with Nonconnah for space other than TQM's space.

Meanwhile, Nonconnah showed TQM's space to other potential sub-tenants, and maintained newspaper, radio and television advertisements for the entire office park. No sub-tenant for TQM's space was located. It is undisputed that TQM never obtained a sub-leasing agreement, a written amendment to the Agreement, or any other document that would relieve TQM from its obligations under the Agreement.

In February 1993, Nonconnah filed suit against TQM in the General Sessions Court of Shelby County for TQM's breach of the Agreement. After a bench trial, the General Sessions Court entered judgment for Nonconnah for the maximum statutory limit of $14,999.00, as well as court costs. TQM appealed the General Sessions Court judgment to the Shelby County Circuit Court, where it was entitled to a *de novo* proceeding. Nonconnah then discovered that TQM was incorporated in Arkansas, not Tennessee, and that TQM had never been authorized to do business in Tennessee. Nonconnah determined further that TQM's corporate charter was revoked in Arkansas in January 1993. Nonconnah thereafter filed an amended complaint in Shelby County Circuit Court naming Fred Thompson, individually, d/b/a Thompson Quality Management, Inc., as an additional defendant.

At the bench trial in this cause, TQM argued that the Agreement was unconscionable because it did not relieve TQM of its obligation to pay the monthly lease payments despite TQM's undisputed financial straits, maintaining that this constituted lack of "mutuality of obligation." TQM contended further that it had an agreement with Mr. Alexander to sub-lease TQM's space, and that Nonconnah had interfered with the sublease agreement with Mr. Alexander and induced him to lease space other than TQM's space. Finally, TQM argued that Nonconnah failed to make sufficient efforts to mitigate its damages.

Regarding Nonconnah's alleged interference with Mr. Alexander's sublease of TQM's space, Thompson testified at the trial that he believed that he had reached an agreement with Mr. Alexander to sublease his space. He testified that Alexander then met with Sorrell, Nonconnah's leasing agent. Thompson alleged that Sorrel interfered with his negotiations with Alexander by leasing Alexander space with Nonconnah other than TQM's space.

Further proof at trial indicated that Alexander sent a letter to Sorrell dated June 8, 1992. The

2

letter requested Nonconnah's assistance in sub-leasing Alexander's current office space because Alexander was "currently pursuing arrangements to sub-lease the offices of [TQM]". Alexander's letter does not indicate that an agreement with TQM had been finalized, but only that the parties were "pursuing arrangements." At trial, counsel for Nonconnah read into the record Alexander's deposition testimony regarding the status of his alleged agreement with TQM to sub-lease TQM's vacant office:

> Q: ...[D]id you subsequently make a decision about whether or not to sublease that space?
> A: (by Alexander) Yes, we did.
> Q: What was that decision?
> A: Not to lease it.
> Q: Did you and Mr. Thompson ever reach a verbal agreement that you would sublease the space?
> A: No, we didn't.

Alexander stated that "We were only talking about it [the possibility of subleasing] and negotiating it. We hadn't reached any settlement in it or final arrangements on it." Alexander testified that several factors caused him to decide not to sublease TQM's space - the two years remaining on TQM's lease, the increase in rent that Alexander would incur, and the fact that TQM would continue to maintain a small office on the premises. Alexander testified that his decision not to sublease from TQM was not due to any action taken by Nonconnah or any Nonconnah agent:

> Q: Did Steven Sorrel or anyone at Nonconnah Corporate Center do anything to attempt to dissuade you from subleasing that space from Mr. Thompson?
> A: No.
> Q: Was the decision not to sublease strictly your own based on the concerns you just testified to?
> A: Yes, it was based on my own concerns.

It was undisputed that no written subleasing agreement was signed.

Regarding Nonconnah's efforts to mitigate its damages, a commercial leasing agent for Nonconnah testified at trial, describing their efforts to sublease TQM's space:

> Q: Did you show the space that Mr. Thompson had vacated to other people who might be potential lessees?
> A: I did, and I have up until recently.
> Q: Have you continually tried to release it since the time that Mr. Thompson gave you permission to do so?

A:    At every opportunity.
Q:    Do you know how many times you have shown that property or can you tell us?
A:    I personally have probably, going on recall, shown it to six or eight different operations, some of which I can name.

******

Q:    How did you try to market this space other than to people that you have named and people that would come in who might be potential lessees?
A:    We maintain three days a week in the Commercial Appeal ads that will give a range of space that will cover most anything that is available in the park....There are display ads periodically in the newspaper. We also run TV and radio ads which generate some traffic, but basically are image building and an educational process....
Q:    What about signs, do you have signs up showing spaces?
A:    There are signs scattered around the [office] park.

TQM offered no proof as to measures Nonconnah failed to take in order to mitigate its damages.

In addition, Nonconnah asserted that Thompson should be held individually liable for TQM's indebtedness. Nonconnah argued that the trial court should permit Nonconnah to "pierce" TQM's "corporate veil" to permit Thompson's individual liability. On this issue, Thompson admitted on cross-examination that, of 10,000 shares of stock, only 1,000 had been issued. Thompson indicated that he was the only shareholder, the only officer and the only director. He stated that tax records were kept, but that there were no corporate minutes or annual reports. Thompson testified that, at the time of his testimony, TQM was not capitalized and there was no paid-in capital. After leaving Nonconnah, Thompson worked out of his home.

Nonconnah also argued that Thompson should be held liable for TQM's debts because TQM's corporate charter had been revoked and TQM failed to obtain a certificate of authority to do business in Tennessee. Nonconnah presented undisputed evidence that TQM was not incorporated in Tennessee and had no certificate of authority to do business in Tennessee. TQM was incorporated in Arkansas, but the State of Arkansas revoked TQM's corporate charter in January, 1993, nearly six months after TQM vacated its Nonconnah office space. Based on the revocation of TQM's corporate charter, as well as the piercing of TQM's corporate veil, Nonconnah maintained that Thompson should be held individually liable for TQM's indebtedness.

At the conclusion of the bench trial, the trial court entered judgment in favor of Nonconnah

for $3,015.00 in damages and $1,000.00 in attorney's fees.  The trial court's findings of fact and

conclusions of law included the following:

FINDINGS OF FACT

3. Mr. Thompson paid rent for one (1) year.
4. Mr. Thompson lost one of his large accounts which caused him great hardship in fulfilling all obligations of the Lease.
5. Mr. Thompson began negotiating to get out of the remaining two (2) year obligation of the Lease.
6. Mr. Thompson negotiated with several people, one of whom was a present tenant of Nonconnah, Mr. Leonard Alexander ("Mr. Alexander").
7. Mr. Thompson thought he had entered into an agreement with Mr. Alexander to sublease the space.
8. Mr. Thompson gave notice to Nonconnah that he would be moving out in late June, 1992.
9. There was some kind of agreement between Mr. Thompson and Mr. Alexander.
10. Mr. Sorrell, agent for Nonconnah, offered Mr. Alexander a sweetheart deal which frustrated the agreement that Mr. Thompson and Mr. Alexander had negotiated.
11. Nonconnah attempted to rent everything but the space leased to TQM, by and through Fred Thompson as President, because Nonconnah knew rent was accruing on that space and not on other vacant space.
12. Mr. Thompson gave proper notice and moved out timely.
13. The corporation (TQM) was viable at the time that the indebtedness accrued.

CONCLUSIONS OF LAW

2. Nonconnah did not prove that it mitigated damages and did not prove that it offered the property at a reduced rate, or for one-third, or for whatever it had to in order to relieve Mr. Thompson.
3. The lease is unconscionable because there is no mutuality of obligation.
4. Mr. Thompson could not terminate the lease despite hardship.
5. Nonconnah is entitled to a reasonable amount of the Lease obligation.
6. A reasonable amount of the Lease obligation would be for ninety (90) days (three (3) month's rent) after June 1 at ($1,005.00) per month for a total of ($3015.00).
8. Defendants are not obligated to pay the amounts due pursuant to the terms and conditions of the Lease Agreement including but not limited to the increased rent, operating expenses, real estate taxes, rent adjustments, late charges, attorney's fees, collection costs, or other obligations contained in the Lease Agreement.
9. The corporation (TQM) was viable at the time the indebtedness accrued; therefore, the corporation is obligated and not the defendant personally.

From this decision, Nonconnah now appeals.

On appeal, Nonconnah argues that the trial court erred in holding that the lease agreement

5

was unconscionable because there was no "mutuality of obligation." Nonconnah also contends that the trial court erred in finding that there was an agreement between TQM and Alexander to sublease TQM's space, and that Nonconnah interfered with this agreement. In addition, Nonconnah asserts that the trial court erred in holding that Nonconnah had the burden of proving reasonable efforts to mitigate its damages, and in finding a failure to mitigate damages. Nonconnah also argues that Thompson should be held individually liable for sums due from TQM. Nonconnah asks this Court to hold TQM, and Thompson, liable for all past due rent, contractual obligations and attorney's fees.

Our review in this case is *de novo* on the record of the trial court, with a presumption of the correctness of its factual findings, unless the evidence preponderates against those findings. Rule 13(d), Tenn. R. App. Proc. No presumption of correctness attaches to the trial court's conclusions of law. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995).

## I. UNCONSCIONABILITY

Nonconnah argues that the trial court erred in finding that the Agreement was unconscionable because there was no mutuality of obligation. In *Dobbs v. Guenther*, 846 S.W.2d 270 (Tenn.App.1992) this Court discussed mutuality of obligation:

> Consideration is a necessary ingredient for every contract, but mutuality of obligation is not unless lack of mutuality will leave one party without consideration for his or her promise. That portions of a contract may apply to one party but not to others has no bearing on the mutuality of parties' obligations as long as consideration exists and all parties are bound to honor the contract.

*Id.* at 276 [citations omitted]. In *Dark Tobacco Growers Co-Op Assoc. v. Mason*, 150 Tenn. 228, 263 S.W. 60 (Tenn. Dec. Term 1923), the Tennessee Supreme Court held:

> Generally, there is mutuality of obligation where both parties undertake to do something. A contract does not lack mutuality merely because every obligation of the one party is not met by an equivalent counter obligation of the other. Mutuality of contract means that an obligation rests upon each party to do or permit to be done something in consideration of the act or promise of the other.
> ***
> It is invariably held that the promise of one party is a valid consideration for the promise of the other party.

*Id.,* 150 Tenn. at 250-51, 263 S.W. at 67. (quoting in part from *Texas Seed & Floral Co. v. Chicago Set & Seed Co.*, 187 S.W. 747 (Tex.Civ.App. 1916)).

This Court has stated that a contract may be deemed unconscionable when:

> [T]he inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other.

*Haun v. King*, 690 S.W.2d 869, 872 (Tenn. App.1984) (quoting *Brenner v. Little Red Schoolhouse*, 302 N.C. 207, 274 N.E.2d 206, 210 (N.C. 1981)).

In signing the Agreement in this case, both parties surrendered rights they previously held. Nonconnah was contractually obligated to provide TQM with office space at a preordained price irrespective of future market conditions; TQM was obligated to pay Nonconnah a set rate of monthly rent for the next three years. The trial court appeared to conclude that the Agreement was unconscionable because it did not contain an "escape clause" for TQM in the event of financial difficulties:

> The only thing that the tenant or the lessee is to do is pay. There is no way that he can terminate [the Agreement] even when he is confronted with this type of hardship [losing an account].

There is no proof in the record indicating that the rental rate paid by TQM was unjust or even unfavorable. Indeed, the record indicates that the Agreement was a standard commercial lease agreement entered into between two experienced, commercial enterprises. Both parties knowingly undertook quantifiable risks. We find that the trial court erred in holding that the Agreement lacked mutuality of obligation and in concluding that the lack of an escape clause for TQM in the event of financial difficulty rendered the Agreement unconscionable. The trial court is reversed on this issue.

## II. INTERFERENCE WITH SUBLEASE

Nonconnah next alleges that the trial court erred in determining that Sorrell, Nonconnah's commercial leasing agent, interfered with an agreement between TQM and Alexander to sublease TQM's vacated premises. The trial court determined that Sorrell conferred with Alexander, who then revoked an alleged agreement he had made with Thompson in favor of a better offer to rent other office space with Nonconnah.

It is undisputed that there was no written sublease agreement between Alexander and TQM, as was required under the Agreement between Nonconnah and TQM. Thompson alleges that he believed that he had a verbal agreement with Alexander to sublease TQM's space, while Alexander testified that he had no such agreement with Thompson. However, Alexander's unrefuted testimony

7

was that no one associated with Nonconnah dissuaded him from subleasing TQM's space, and that his decision was based on his own concerns about factors such as the length of the lease and the increase in rent. Under these circumstances, even if there were a subleasing agreement between Alexander and TQM, the evidence preponderates against the trial court's finding that Nonconnah interfered with the alleged agreement. Consequently, the trial court is reversed on this issue.

### III. MITIGATION OF DAMAGES

Nonconnah next contends that the trial court erred in concluding that Nonconnah failed to "prove that it mitigated damages." Nonconnah asserts that the trial court applied an improper standard regarding the burden of proof, by requiring Nonconnah to prove that it mitigated its damages.

In *Hailey v. Cunningham*, 654 S.W.2d 392 (Tenn.1983), the Tennessee Supreme Court addressed the issue of mitigating damages in re-leasing commercial premises. The *Hailey* court held that, in actions between lessors and lessees, the lessee "had the burden of proof to establish failure of the lessors to mitigate their damages." *Id.* at 396. In *Hailey* the lessor testified that a realtor "placed a rental sign on the premises and advertised it on several occasions in a local newspaper" in order to re-lease the premises. *Id.* at 395. The *Hailey* court further noted that the lessees had failed to meet their burden and observed that the lessors had:

> [E]ngage[d] two different commercial real estate firms to attempt to re-rent the property, had it advertised in newspapers on several occasions, and had a rental sign placed thereon. There is no suggestion of anything else that the lessors could reasonably have ben expected to do.

*Id.* at 396. Therefore, the burden of proof was on TQM to establish that Nonconnah failed to mitigate its damages.

Nonconnah also maintains that the trial court applied an unreasonably high standard to Nonconnah regarding its efforts to mitigate its damages. The trial court concluded that Nonconnah failed to do "whatever it had to in order to relieve Mr. Thompson." In *Nashland Associates v. Shumate*, 730 S.W.2d 332 (Tenn.App.1987), this Court stated that a landlord "must do what is fair and reasonable to reduce his damages." *Id.* at 333. Therefore, the trial court's finding overstates Nonconnah's duty to mitigate and exceeds the "fair and reasonable" standard established in *Nashland*.

8

In this case, unrefuted testimony from Nonconnah's leasing agents established that TQM's space was shown to at least six potential tenants, and that advertisements for the office park as a whole regularly appeared in television, newspaper and radio. TQM offers no proof of additional measures Nonconnah could have taken to sublease TQM's space. Based upon the evidence in the record, it is clear that the defendants failed to carry their burden of proof and that the trial court erred in finding that Nonconnah did not mitigate its damages.

## IV. DAMAGE AWARD AGAINST TQM

Nonconnah next alleges that the trial court erred in failing to award Nonconnah the full measure of damages it incurred. The trial court awarded Nonconnah damages of $3,015, attorney's fees of $1,000 and discretionary costs of $672.96, based on its conclusions that the Agreement was unconscionable, that Nonconnah interfered with a sublease to Alexander, and that Nonconnah failed to mitigate its damages.

It is well-settled in Tennessee that a "court is not at liberty to make a new contract for parties who have spoken for themselves." *Smithart v. John Hancock Mut. Life Ins. Co.*, 167 Tenn. 513, 525, 71 S.W.2d 1059, 1063 (Tenn.1934). *See also Stone v. Martin*, 185 Tenn. 369, 374, 206 S.W.2d 388, 390 (Tenn.1947). "Parties to a contract are free to allocate risks and burdens between themselves as they see fit." *Brown Bros., Inc. v. Metro. Govt. of Nashville and Davidson County*, 877 S.W.2d 745, 749 (Tenn.App.1993). In *Dobbs v. Guenther*, 846 S.W.2d 270, 276 (Tenn.App.1992) this Court stated that "courts will not create or rewrite a contract simply because its terms are harsh or because one of the parties was unwise in agreeing to them."

In this case, the trial court selected a three-month period in which to assess damages against Nonconnah, rather than the full two-year period remaining under the terms of the parties' agreement. The three-month period mirrored the trial court's finding that Nonconnah failed to mitigate its damages. However, because we have reversed the trial court's findings of unconscionability, interference with a sublease to Alexander and failure to mitigate damages, we must consider evidence from the record regarding the damages incurred by Nonconnah. Nonconnah submitted the

following figures at trial demonstrating the damages resulting from TQM's breach of the lease agreement:

| | |
|---|---|
| Past Due Rent, Operating Costs and Real Estate Taxes: | $25,279.37 |
| Contractual Obligation for Delinquency: (at 10%) | $ 2,527.94 |
| Attorney's Fees: | $ 10,629.69 |
| Expenses: | $ 809.74 |
| Anticipated Collection Efforts: | $ 775.00 |
| **Total:** | **$40,021.74** |

Under the Agreement, Nonconnah is entitled to the past due rent, including rent adjustments, as well as the operating costs and the real estate taxes. In addition, paragraph 6 of the Agreement states that Nonconnah may collect a ten percent late charge for delinquent rental payments.

The Agreement provides further that TQM must pay ". . .all costs of collection and all reasonable attorney's fees. . . ." From the record, it is unclear whether the item of claimed damages deemed "expenses" are costs of collection, since Nonconnah also seeks damages for "anticipated collection efforts." The Agreement provides only for payments of costs of collection actually incurred, not "anticipated" costs. Consequently, on remand, the trial court must determine the costs of collection actually incurred by Nonconnah, as well as a "reasonable" amount of attorney's fees, in light of our decision on the issues raised by Nonconnah on appeal.

Accordingly, we reverse the trial court's award of damages and remand for a determination of the costs of collection actually incurred, and a reasonable attorney's fee.

## V. INDIVIDUAL LIABILITY OF THOMPSON

Finally, Nonconnah contends that the trial court erred in holding that Fred Thompson was not individually liable for the debts incurred by TQM. Nonconnah asserts two alternative theories under which Thompson should be deemed individually liable for TQM's debts: 1) Thompson failed to follow the required corporate formalities, thus the trial court should "pierce the corporate veil" of TQM; and 2) the state of Arkansas had revoked TQM's corporate charter at the time that TQM incurred its liability to Nonconnah, and alternatively, that TQM violated Tennessee law by failing to obtain a certificate of authority to transact business in Tennessee as a foreign corporation. Because TQM was an Arkansas corporation, before we consider the question of Thompson's individual liability, we must determine whether the law of Arkansas or Tennessee is applicable.

10

## A. Conflict of Laws

Neither party disputes the fact that Tennesseee law applies to the determination of TQM's liability under the Agreement. However, as recently stated in ***Bayberry Associates v. Jones***, 1988 WL 137181 (Tenn.App.1988), ***vacated on other grounds***, 783 S.W.2d 553 (Tenn.1990), an unreported decision from this Court, an issue concerning the individual liability of a shareholder or officer for the corporation's debts is considered an issue regarding the "internal affairs" of a corporation that may be governed by the law of the state of incorporation:

> Claims involving the "internal affairs" of a corporation should be resolved in accordance with the law of the state of incorporation. Internal corporate affairs involve matters peculiar to corporations such as the relationships among the corporation and its officers, directors and stockholders.

*Id.* at *4 (citations omitted). ***Bayberry*** involved a similar conflict of laws question regarding the corporate "internal affairs" doctrine and the appropriate state law to apply. The ***Bayberry*** court cited the Restatement (Second) of Conflict of Laws, § 309 (1969), which states:

> The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and stockholders, except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied.

*Id.* Section 6, cited in Section 309 above, lists the following as "factors relevant to the choice of the applicable rule of law," to be considered in the absence of a statutory directive to the contrary:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of the interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatements (Second) of Conflict of Law § 6 (1969). ***Bayberry*** adopted the "internal affairs" doctrine, as set forth in the Restatement, which applies a balancing test between these factors and the predisposition toward applying the law of the state of incorporation in matters involving the internal affairs of the corporation. ***Bayberry***, 1988 WL 137181 at *4-5.

In the case at bar, the lease agreement involved TQM's corporate office in Tennessee. However, Thompson testified that the majority of his business at the time he entered into the Agreement occurred in Arkansas. The proof in the record discusses TQM's contacts with Tennessee

at the time of trial, May, 1995, but does not indicate in any detail TQM's contacts with Tennessee prior to that time. Considering the factors listed in Section 6 of the Restatement, set forth above, balanced against the internal affairs doctrine, which favors the application of Arkansas law, we find that the proof is insufficient to demonstrate that Tennessee law should be applied. Accordingly, we find that Arkansas law governs the issue of Thompson's individual liability for TQM's debts.

We will consider separately the two theories under which Nonconnah asserts Thompson's individual liability. Nonconnah has asserted that TQM's "corporate veil" should be "pierced" due to Thompson's failure to follow certain corporate formalities which are concomitant with the separate existence and limited liability afforded a corporation under the laws of Arkansas.

### B. Piercing the Corporate Veil

It is well settled in Arkansas that a corporation and its stockholders are separate and distinct entities, even though the stockholder may be the owner of a majority of the stock in a corporation, and that the doctrine of piercing the corporate veil should be applied with great caution. *Humphries v. Bray*, 271 Ark. 962, 966-67, 611 S.W.2d 791, 793 (Ark.App.1981); *Banks v. Jones*, 239 Ark. 396, 399, 390 S.W.2d 108, 100 (Ark.1965). It is only when the privilege of transacting business in a corporate form has been illegally abused to the injury of a third person that the corporate entity should be disregarded. *Fausett Co. v. Rand*, 2 Ark. App. 216, 221, 619 S.W.2d 683, 686 (Ark.App.1981). The issue of whether the corporate entity has been fraudulently abused is a question for the trier of fact, and this finding will not be disturbed on appeal unless it is clearly erroneous. The one seeking to pierce the corporate veil and disregard the corporate entity has the burden of proving that the corporate form was abused to his injury. *See National Bank of Commerce v. HCA Health Servs. of Midwest, Inc.*, 304 Ark. 55, 59, 800 S.W.2d 694, 697 (Ark.1990).

Conditions under which the corporate entity may be disregarded or looked upon as the alter ego of the principal stockholder  vary according to the circumstances of each case and are fact specific. *Winchel v. Craig*, 55 Ark. App. 373, 380-81, 934 S.W.2d 946, 950 (Ark.App.1996). Factors to consider include:

> [I]nadequate capitalization or the failure to issue stock.... Another fact emphasized in the application of the doctrine is the failure to observe corporate formalities, at least as to corporations that are not closely held. Failure to observe corporate formalities includes such activities as commencement of business without the issuance of shares, lack of shareholders' or directors' meetings, lack of signing of

12

consents, and the making of decisions by shareholders as if they were partners. Other facts emphasized include nonpayment of dividends, the insolvency of the debtor corporation at the time [the liability was incurred], siphoning of funds of the corporation by the dominant shareholder, commingling of corporate and personal assets, nonfunctioning of other officers and directors, absence of corporate records,

.... [T]he most common significant factors justifying disregarding a corporate entity have been undercapitalization, failure to observe formalities, nonpayment of dividends, siphoning of corporate funds by dominant stockholders, non-functioning of other officers and directors, absence of corporate records...and use of the corporate entity in promoting injustice or fraud. . . The failure to distinguish between corporate and personal property, the use of corporate funds to pay personal expenses without proper accounting, and the failure to maintain complete corporate and financial records are looked upon with extreme disfavor. Consequently, undercapitalization, disregard of corporate formalities and the like coupled with an element of injustice, fraud or fundamental unfairness have been regarded fairly uniformly to constitute a basis for an imposition of individual liability under the doctrine.

Fletcher, *Cyclopedia of the Law of Private Corporations*, §41.30 (1990).

In the case at bar, Thompson testified that TQM had 10,000 shares of stock, but only 1,000 had been issued. He acknowledged that he was the only shareholder, officer or director. When asked if TQM maintained corporate records, he responded, "To some degree, more or less tax records." He admitted that TQM kept no corporate minutes, and that TQM had no capital or paid-in capital. Since leaving Nonconnah, TQM was operated out of Thompson's home.

However, Thompson also testified that he hired both an attorney and a CPA to establish the corporation and perform the necessary documentation. While records of corporate meetings were not kept, TQM established a corporate bank account, maintained accounting records, at one time owned office furniture, a copy machine, and a computer, and had previously maintained its headquarters at Nonconnah Center. Thompson also testified that TQM's assets had been depleted since its incorporation in 1990. There was no evidence that Thompson siphoned corporate funds or commingled TQM's assets and his personal assets.

The record does not reflect that Thompson utilized the corporate form to perpetrate a fraud on Nonconnah. Thompson testified that he first learned of the revocation of TQM's charter at the time that the amended complaint was filed in 1994. He testified that he attempted to correct the cause of the revocation, the late payment of franchise taxes, although at the time of trial in May, 1995 Arkansas had not reinstituted TQM's corporate charter. The record does not indicate whether TQM was undercapitalized at the time it entered into the Agreement with Nonconnah. Thompson's testimony concerns TQM's financial health at the time of the trial, rather than at the time that it

13

entered into the Agreement.

Considered in its entirety, the evidence does not preponderate against the trial court's decision that Nonconnah should not be permitted to pierce TQM's corporate veil. The trial court is affirmed on this issue.[1]

### C. Revocation of the Corporate Charter

In the alternative, Nonconnah argues that Thompson should be held personally liable for debts that TQM incurred subsequent to revocation of its corporate charter.

The issue of liability of an individual shareholder for corporate debts incurred after revocation was considered in *Mullenax v. Edwards Sheet Metal Works, Inc.*, 279 Ark. 247, 650 S.W.2d 582 (Ark.1983). *Mullenax* involved a corporation, Mid America Video, whose charter was revoked for failing to pay franchise taxes. During the six month period in which the corporate charter was revoked, Mid America received an invoice from one of its suppliers for certain components manufactured for Mid America. *Id.* 279 Ark. at 248, 650 S.W.2d at 583. The supplier later sued Mid America for nonpayment for these parts. The Arkansas Supreme Court affirmed the trial court's determination that Mid America's incorporators were personally liable for the corporate debts incurred during the time in which the charter was revoked. *Id.* 279 Ark. at 249, 650 S.W.2d at 583-84. Since the invoices had been presented to Mid America during the six month "window" during which its charter had been revoked, the incorporators were held personally liable for the value of the components. *Id.*

In the case at bar, Nonconnah presented unrefuted evidence that TQM's corporate charter was revoked on January 7, 1993 and had not been reinstated as of May 2, 1995. TQM initially breached the Agreement in August 1992 by failing to pay its rent. Thompson became personally liable on any debts incurred by TQM while its charter was revoked. Thus, Thompson would be held personally liable for the amount due from TQM under the agreement from January 7, 1993 through the termination of the lease in July 1994. The decision of the trial court is reversed as to this time

---

[1]Nonconnah has alternatively asserted that Thompson is individually liable due to TQM's failure to obtain a certificate of authority to do business in Tennessee. However, the statute cited by Nonconnah, Tenn. Code Ann. § 48-12-104, discusses the liability of a person who acts on behalf of a corporation, while he knows that there is no incorporation. Thus, any asserted liability of Thompson under this statute would commence when TQM's charter of incorporation was revoked. Consequently, this issue is pretermitted by our holding regarding the revocation of TQM's corporate charter, discussed below.

14

period, and the cause is remanded for a determination of the amounts for which Thompson is individually liable.

## VI. CONCLUSION

In sum, we find that the Agreement did not lack mutuality of obligation and was not unconscionable. Because Nonconnah's actions did not cause Alexander to renege on any alleged agreement to sublease TQM's space, Nonconnah cannot be deemed to have "interfered" with any such agreement. The burden of proving Nonconnah's failure to mitigate damages was on TQM, and TQM failed to carry its burden on this issue. TQM is liable for damages for amounts unpaid under the Agreement for the entire term, from the date of breach through termination of the Agreement. The question of the amount of Nonconnah's damages must be remanded to the trial court for a determination of the costs of collection and for assessment of reasonable attorney's fees, pursuant to the Agreement. Nonconnah will not be permitted to pierce TQM's corporate veil. However, because TQM's charter was revoked, under Arkansas law, Thompson will be held personally liable for amounts due under the Agreement from the date of revocation through the termination of the Agreement. The determination of this amount is remanded to the trial court.

The decision of the trial court is affirmed in part and reversed in part, as set forth above. Costs are taxed to Appellees, for which execution may issue if necessary.

_____ **HOLLY KIRBY LILLARD, J.**

**CONCUR:**

_____
**ALAN E. HIGHERS, J.**

_____
**DAVID R. FARMER, J.**

15