HCA HEALTH SERVICES OF MIDWEST, INC., d/b/a
Doctors Hospital *v.* NATIONAL BANK OF COMMERCE
(of El Dorado, Arkansas), Guardian of the Estate (only) of
James Talley, a Minor, and Shirley Talley and George
Talley, Parents

87-150 745 S.W.2d 120

Supreme Court of Arkansas
Opinion delivered February 16, 1988
[Rehearing denied March 7, 1988.]

526

*Wright, Lindsey & Jennings*, for appellant.

*Friday, Eldredge & Clark*, by: *W. A. Eldredge, Jr., Calvin J. Hall*, for amicus curiae Arkansas Hospital Association.

*Whetstone & Whetstone*, by: *Benard Whetstone, Bud Whetstone*, and *Bobby Davidson*, for appellees.

TOM GLAZE, Justice. This case involves a medical malpractice action against the appellant, HCA Health Services of Midwest, Inc., d/b/a Doctors Hospital, and three of its nurses, Elaine Firestone, Frances Tully and Brenda Swayze. The suit was instituted by the appellees, as guardians of James Talley, who was born at Doctors Hospital in Little Rock on September 7, 1982. James's birth had been uneventful, and he appeared normal and healthy until shortly after midnight on September 8, 1982. At that time, Tully, who was working in the hospital nursery, noticed James had no heartbeat and had stopped breathing. Although James subsequently was resuscitated, he has since evidenced signs of brain damage. In this suit against the appellant, appellees alleged that the hospital nursery was inadequately staffed and dangerously designed, that the hospital officials knew of the danger and failed to correct it, that the nurses failed to monitor James's condition adequately and that James had been placed on a defective mattress.

At trial, the judge directed verdicts in favor of nurses Tully and Swayze, and the jury, based upon answers to interrogatories, found in favor of nurse Firestone, who was in charge of the nursery at the time the incident happened. The jury found against the appellant and awarded appellees $2,620,000 in compensatory damages and $2,000,000 in punitive damages. Appellant raises nine points for reversal on appeal, and appellees cross-appeal,

challenging the judge's ruling which dismissed the two nurses out of the case.

We must reverse this case because of prejudicial remarks made by appellee's counsel in his opening and closing arguments to the jury. However, because that error is inextricably tied to the type and amount of damages awarded by the jury, we first consider the appellant's contention that punitive damages are not recoverable under the Arkansas Medical Malpractice Act, as compiled in Ark. Code Ann. §§ 16-114-201 to -209 (1987). We hold such damages are recoverable.

In its amici curiae brief, the Arkansas Hospital Association argues that damages recoverable in a cause of action for medical injury are set forth in § 16-114-208, and because the statute fails to specifically enumerate punitive damages as a recoverable element, the legislature intended to exclude punitive damages in medical injury actions. We cannot agree.

Recently, we rejected a similar argument in *Vickery* v. *Ballentine*, 293 Ark. 54, 732 S.W.2d 160 (1987). There, Vickery contended that, because Arkansas's wrongful death provisions were laws in derogation of common law, those laws should not be construed to impose a liability that is not clearly expressed. In rejecting Vickery's argument, this court noted that Arkansas's case law was clear that an injured party may recover punitive damages as a consequence of a wrongdoer's willful and wanton, tortious conduct. We said further that the purpose of punitive damages is not to compensate the injured party but to impose a monetary penalty on the defendant and to discourage others from similar behavior. *Id.* at 56-57, 732 S.W.2d at 162. In enacting the Arkansas Medical Malpractice Act, the Arkansas General Assembly did not restrict an injured party from claiming punitive damages when a medical-care provider, as defined by that Act, was guilty of willful and wanton misconduct. If the General Assembly had intended such a restriction, it could have easily set it out in the Act. The appellant's attempt to construe the Act so as to exclude exemplary damages is simply unpersuasive. In holding that punitive damages are recoverable in medical malpractice actions, we follow what appears to be the prevailing view. *See* 70 C.J.S. *Physicians and Surgeons* § 127(c) (1987) and David M. Harney, *Medical Malpractice*, § 3.11 (1973); *see also* Annot.,

*Medical Malpractice—Punitive Damages*, 27 ALR3d 1274 (1969).

Appellant next argues there is insufficient evidence to support the verdict for either compensatory or punitive damages. Further, appellant also contends that the trial court erred in allowing appellees to make certain prejudicial references to the jury concerning the appellant's parent corporation, Hospital Corporation of America (HCA). That corporation is not, and never has been, a party to this litigation. Because we hold that appellees erred in their arguments to the jury, we discuss that point first.

Appellant, HCA Health Services of Midwest, Inc., is a wholly-owned subsidiary of HCA, and for that apparent reason, was the party the appellees chose to file their claim against. Nonetheless, appellees, in their opening and closing statements, mentioned HCA as though it was the defendant. In anticipation of appellees' closing remarks, the appellant asked the trial judge to prohibit appellees from arguing punitive damages as though HCA was the defendant-corporation that the jury should punish by awarding such damages. The judge denied appellant's motion, thereby giving the appellees the latitude and discretion to interweave HCA's name throughout their closing argument. The following excerpts from appellees' closing remarks make it clear that appellees implored the jury that HCA, a nation-wide, profit-making corporation, should bear much of the responsibility for James Talley's injury:

> [W]hen I am talking about this item here, about punitive [damages], to deter others from similar conduct, in a sense, I'm talking on behalf of the thousands and tens of thousands of other newborn babies that are in nurseries and right this minute, . . . in nurseries all over the United States and a lot of them are in hospitals that operate for a profit.
>
> * * *
>
> Up to now, HCA of Midwest [appellee] has been masquerading as a respectable health service institution, but you, in this case, have been privileged in this lawsuit to pull aside the veil of pretense behind which they operate and see the

real profit motivated operation that deals with the very lives and minds and bodies of the tenderest newborn babies of its subject matter.

\* \* \*

Now, I want to go into some of the details of what I have designated as their total operation of deceit. To begin with, I'm sure all of you have driven on the freeway and driven by Doctors Hospital and all of you have seen that big sign up there that says, "Doctors Hospital" . . . But the truth is the doctors don't own a dime of it . . . Actually, it is owned by a bunch of investors for profit.

\* \* \*

Now, Kinder [executive director of Doctors Hospital] told you that it is owned by the HCA Midwest, the HCA Midwest is owned by HCA which, in turn, Mr. Kinder testified, is on the New York Stock Exchange and is operated by investors for profit. So the only way any doctor in Little Rock or anywhere else can own any part of that hospital is if they go up there on the New York Stock Market and buy some stock and invest for profit. So the first deceit they have is putting out the name of Doctors Hospital.[1]

\* \* \*

I was saying that you've got these dangerous operations by these profit corporations that are running all these profit hospitals and I think, again, from our own common knowledge, we know about these hospitals running for profit and selling services to patients to make a profit off of it.

---

[1] Over appellant's objection, appellees read Kinder's deposition to the jury which included these references to HCA. The trial court denied appellant's objection and motion for a mistrial.

\* \* \*

Now, you might wonder, why doesn't somebody do anything about these situations of these hospitals and these corporations all over the United States operating nurseries for profit and short staffing them and like was done and leaving children alone in a room by themselves, that that's done just to make money.

\* \* \*

On voir dire . . . I asked you, "If you believe from the testimony that plaintiffs are entitled to damages in a large sum and at the same time you feel that the defendants or some of them may not be financially able to pay the amount to which plaintiffs are entitled, will you be willing to go ahead and award the full amount to which you feel that the plaintiffs are entitled and let us worry about collecting it?" And you said, "Yes," all of you said yes. So, let us worry about it. You give the amount you think would accomplish all these purposes and let us worry about it. Don't worry about the amount.

Besides appellees' foregoing closing remarks, they also pointed out in their opening argument that HCA had acquired Doctors Hospital in the name of its subsidiary, the "principal" defendant HCA Health Services of Midwest, Inc., and that HCA had a chain of corporations and a chain of hospitals. Under Arkansas law, the financial condition of a defendant is admissible and may be considered by a jury in determining the amount of exemplary damages to be allowed and what amount of punishment would be inflicted thereby on the theory that the allowance of a given sum would be a greater punishment to a man of small means than one possessing larger wealth. *See Holmes* v. *Hollingsworth*, 234 Ark. 347, 352 S.W.2d 96 (1961) and AMI Civil 2d, 2217 (Supp. 1986). While HCA was never made a party-defendant in this case, appellees' strategy, at least in part, was to emphasize HCA's size and wealth, as well as its connection to HCA Health Services Midwest, Inc, when asking the jury to assess punitive damages against the appellant. Because HCA Health Services Midwest, Inc. was the sole party-defendant here, not HCA, and no reason was shown why their separate identities

should be disregarded, we must conclude the trial court erred in permitting appellees to refer to HCA in their quest for punitive damages.

Because we find it necessary to reverse and remand this cause because of appellee's improper argument, we need not discuss in lengthy detail the appellant's arguments that the evidence was insufficient to support the verdict awarding appellees compensatory and punitive damages. Suffice it to say, when viewing all reasonable inferences from the evidence in the light most favorable to appellees, we believe the evidence clearly supports the jury's finding that appellant's negligence proximately caused James's injury and its award of compensatory damages. James Talley undisputedly showed no sign of any problems prior to his cardiac and respiratory arrest. The events leading up to James's cardiac arrest commenced soon after a shift change that occurred at 11:00 p.m. on September 7, 1982. Nurses Firestone, Tully and Swayze were working in the nursery which, at the time, was occupied by about eighteen babies. The nursery consisted of three connecting rooms, divided by walls that were glass from the middle to the top. After being updated on each of the babies by the nurses on the prior shift, Tully worked with a baby in the admissions room, and Firestone and Swayze went to the second room, containing eleven babies, where they gave their priority to two premature babies and a third one with jaundice. As Tully finished with the baby in admissions, she went into the third room, where there were six babies, including James; she immediately noticed James's condition, and he was rushed to intensive care.

Although the cause of James's arrest is in question, Dr. Stephen Whaley, a pediatrician who arrived at the hospital after the incident, testified Firestone told him the baby was lying face down, and it had been about thirty minutes between the time the baby was last checked and when he was found not breathing. Dr. Whaley said that he thought the bassinet mattress on which James was lying "unquestionably contributed to, or was the cause of his asphyxia." He said that "he looked for other explanations and couldn't find anything else." He said the mattress was old and soft, and was inappropriate for use in the nursery. Whaley further testified that he was alarmed that there had been no nurse in the room, and he did not "think James Talley's injury would have

occurred if there had been a nurse in the room with him." Other testimony was given indicating that the hospital administration had been told of an ongoing need for more nurses in the nursery and that the number of staff on duty the night of James's incident was below the hospital's own standards which were in force at the time. The evidence also reflected that hospital policy provided that no baby was to be left in the nursery room without a nurse in attendance. Although appellant countered much of the foregoing with its own evidence and arguments, we have no problem in holding that sufficient evidence exists to support the verdict determining appellant's negligence caused James's injury and holding it liable for compensatory damages which resulted from that injury.

 Whether the evidence was sufficient to support punitive damages depends, of course, on a different standard than that of mere negligence, *viz.*, whether the appellant knew or ought to have known, in the light of the surrounding circumstances, that its conduct would naturally or probably result in injury and that it continued such conduct in reckless disregard of the circumstances from which malice may be inferred. *See Mo. Pac. R. R. Co.* v. *Ark. Sheriff's Boys' Ranch*, 280 Ark. 53, 655 S.W.2d 389 (1983); *Airco, Inc.* v. *Simmons 1st National Bank*, 276 Ark. 486, 638 S.W.2d 660 (1982). Appellees' theory, underlying their request for punitive damages, focused on the appellant's and its executive director's alleged failures to respond to the entreaties of the physicians to provide enough nurses to insure that no newborn baby would be left unsupervised in a nursery. Appellees contended that appellant's main concern was one of saving money rather than the safe care of babies. Conflicting evidence was presented on this issue and whether or not the evidence is sufficient to support punitive damages is a close question. Upon retrial, this evidence may be different, so we do not address in full the appellant's argument as to whether appellees' proof is adequate to support an award of punitive damages. *Mo. Pac. R. R. Co.*, 280 Ark. 53, 65, 655 S.W.2d 389, 395. We merely point out that if it can be shown that appellant knew, or ought to have known, that its hospital policy would inflict damages but continued that policy anyway with a conscious indifference to the consequences, appellant could be liable for punitive damages.

 Appellant's next point that we address, since it will

arise again at retrial, is whether the trial court erroneously permitted appellees to introduce into evidence a post-incident disciplinary proceeding involving nurse Firestone. We believe it did. Firestone was disciplined after James's injury, and a personnel action report, signed by a hospital department director and personnel director, reflected what had happened to James and noted a violation of nursing policy had occurred because no nurse was in James's room when his problem began. A written reprimand was placed in Firestone's file. She appealed and filed a written response, which appellees, over appellant's objection, introduced at trial. In her response, Firestone complained about the inadequate number of nurses on staff at the time of James's incident and her written response was obviously prejudicial if, indeed, it was erroneously admitted into evidence. Appellees argue that Ark. Code Ann. § 16-46-105(c) (1987) permits the discoverability and admissibility of Firestone's written response as an "incident report kept with respect to any patient in the course of business of operating a hospital . . ." We cannot agree. Firestone's response was not a medical record, incident report or other record *kept with respect to any patient* within the meaning of the language and intent of § 16-46-105(c), but instead it is a record filed with the administrative staff which became a part of a disciplinary action kept with respect to one of the hospital's personnel, *viz.*, Firestone. As such, the trial court should have excluded Firestone's written response as privileged communication as proscribed pursuant to § 16-46-105(a) which reads as follows:

> "*The proceedings, minutes, records or reports of organized committees of hospital medical staffs or medical review committees of local medical societies having the responsibility for reviewing and evaluating the quality of medical or hospital care, and any records compiled or accumulated by the administrative staff of such hospitals* in connection with such review or evaluation, together with all communications or reports originating in such committees, shall not be subject to discovery or admissible in any legal proceeding and *shall be absolutely privileged communication*; nor shall testimony as to events occurring during the activities of such committees be admissible." (Emphasis added.)

 Appellant offers two other arguments that could arise at retrial, but the first we dispose of in quick fashion. Appellant argues that the expert testimony of Leslie Ball should have been excluded because he had no experience in the administration of hospitals and is what appellant calls a "general purpose plaintiff's witness." Appellant cites no authority and offers no convincing argument to underscore this point. Therefore, we need not address it except to repeat the well-settled rule that an expert witness's qualifications are a matter lying within the trial judge's discretion, to be upheld on appeal, absent an abuse of discretion. *Hardy* v. *Bates*, 291 Ark. 606, 727 S.W.2d 373 (1987). Based upon the argument presented, we are unwilling to say the trial court abused its discretion in admitting Ball's testimony.

Appellant's last contention is that the trial court erred in admitting evidence of a remedial action taken by appellant after James's incident occurred. Appellees read to the jury two depositions taken of the hospital's executive director, Kinder. In the first deposition, Kinder denied that the glass partitions, which helped separate the rooms in the nursery, were removed after James's incident so as to improve the transmission of sound. In the second deposition, Kinder testified that he had learned since his first deposition that the glass had been removed. Appellant objected to appellees' inquiries of Kinder pertaining to the removal of the glass partitions, and now urges such evidence was excludable under Unif. R. Evid. 407, Ark. Code Ann. § 16-41-101 (1987).[2]

 While such remedial changes reflected in Kinder's testimony may be excludable under Rule 407, we fail to see the prejudice since the same subject matter was fully covered without objection in Firestone's testimony. In this respect, Firestone was asked if the hospital had structurally changed the nursery after James's incident, and she revealed it had. She said the window was removed, making a permanent opening between the rooms in the nursery. Firestone said this change allowed the nurses to

---

[2] The record is confusing and actually indicates the appellant's objection occurred after Kinder's depositions were read to the jury, rather than before. Appellees do not suggest the objections were untimely, and we can only assume an error was made in the manner the record was compiled and in some of the introductory language used before listing the appellant's objections to Kinder's deposition.

communicate with one another while being in different rooms. As this court has stated earlier, the admission of evidence is not prejudicial where similar evidence has been previously admitted without objection. *See Rhine* v. *Haley*, 238 Ark. 72, 378 S.W.2d 655 (1964); *Hooten* v. *DeJarnatt*, 237 Ark. 792, 376 S.W.2d 272 (1964). Since the appellant failed to object to Firestone's testimony regarding the removal of the window, the admission of Kinder's testimony is not prejudicial and therefore we find no reversible error on this point. *See Peoples Bank and Trust Co.* v. *Wallace*, 290 Ark. 589, 721 S.W.2d 659 (1986).

Appellees' sole point for reversal on cross-appeal questions the trial court's granting the appellant's motion for a directed verdict at the end of appellees' case, thereby dismissing nurses Swayze and Tully from this cause. We hold the court erred in doing so. Both Kinder and Swayze testified that the hospital's policy provided that a member of the nursery staff would be present in every room occupied by infants at all times. Although Kinder also testified that it was only a goal of the hospital that no baby in the nursery be left alone without a nurse in the room, he stated at another point in his testimony that this had been made hospital policy, which had been effective since March or April 1982. Swayze, on the other hand, read from a hospital policy and procedures document which indicated that such was hospital policy made effective on May 27, 1982. In either case, Kinder's and Swayze's testimonies reflect that this policy was in force prior to and at the time of James's incident. Nurse Firestone testified that when she came on duty on September 7, 1982, she had three nurses, including herself, and she assessed that she needed to move all the babies to one room and she intended to do so later. She had not made the moves or changes by the time of the incident because she said there was a "time lapse in which those arrangements were being made." The evidence also reflects that the nurses had been on duty one and one-half hours before the time James was found in his arrested condition. And finally, Dr. Whaley testified that he believed James's problem would have been avoided if a nurse had been in the room with him.

The three nurses who testified in this matter gave their versions of what occurred which, if believed by the jurors, might have justified their noncompliance with the hospital's policy. Also, they indicated that they believed that having a nurse

in each room at all times was actually a goal, not policy, at the time James's problem arose. Of course, the nurses are parties to this litigation, and their testimonies cannot be regarded as undisputed. *Nipper* v. *Brandon Co.*, 262 Ark. 17, 553 S.W.2d 227 (1977). However, more on point, this court must review the trial court's direction of a verdict for nurses Swayze and Tully by examining the evidence in a light most favorable to the losing party, the appellees here. *Keck* v. *American Employment Agency, Inc.*, 279 Ark. 294, 652 S.W.2d 2 (1983). Furthermore, the evidence must be given all reasonable inferences and conclusions that work in favor of the losing parties. Generally, if there is any conflict in the evidence, or we find the evidence is not in dispute, but is in such a state that fair-minded people might have different conclusions, then a jury question is presented, and a directed verdict will be overturned. *Id.*, at 297, 652 S.W.2d at 4. Given these standards for review, and viewing the evidence most favorably to the appellees, we believe the facts clearly reveal a jury question regarding the nurses' culpability in failing to comply with hospital policy by not having at least one of them present in each room of the nursery on the night of James's incident. Therefore, we are compelled to reverse the trial court's decision directing a verdict in favor of Swayze and Tully.

For the reasons given herein, we reverse and remand this cause for a new trial.