HEALTH FACILITIES MANAGEMENT CORP.
and Little Rock Healthcare #1 Inc., d/b/a Little Rock Healthcare
& Rehabilitation Center *v.* Mary E. HUGHES, as Executrix of the
Estate of Mildred Smith, deceased, and on Behalf of the Wrongful
Death Beneficiaries of Mildred Smith

05-90                                    227 S.W.3d 910

Supreme Court of Arkansas
Opinion delivered February 9, 2006

*Friday, Eldredge & Clark, LLP*, by: *Tonia P. Jones*, for appellant.

*Wilkes & McHugh, P.A.*, by: *Brian G. Brooks*, for appellee.

Robert L. Brown, Justice. Appellants Health Facilities Management Corporation (Health Facilities Management) and Little Rock Healthcare #1 (Little Rock Healthcare), d/b/a Little Rock Healthcare and Rehabilitation Center, appeal from the judgment entered against them in favor of the appellee, Mary Hughes, as executrix of the estate of Mildred Smith, and on behalf of the beneficiaries of Mildred Smith (the Estate).

The complaint reflects that Mildred Smith became a resident of Little Rock Healthcare on or about January 27, 1997. Her niece, Mary Hughes, testified that she visited Ms. Smith on a weekly basis and that Ms. Smith knew who she was and was able to feed herself. She stated that while Ms. Smith needed assistance with bathing and dressing, she was able to maintain a conversation.

On August 3, 1999, Ms. Smith had a dental appointment. Her niece arrived at the home, and they both were riding in the nursing home's van to the appointment, when the nurse driving the van almost had an accident. Ms. Smith was thrown from her wheelchair to the floor of the van. She hit her head and face on the seat in front of her, and she fractured her tibia. At the time she fell, she had not been fastened into her wheelchair. She remained on the van floor, while being transported back to the nursing home.

After the accident, Ms. Hughes testified that Ms. Smith did not talk much anymore, and did not eat much at all. She started losing weight and became basically bed-bound. Several former employees of the home testified that they had found Ms. Smith lying in her urine at times. The Estate's expert, Holly Brown, a nurse practitioner, testified after reviewing Ms. Smith's records that Ms. Smith received substandard care at the nursing home in relation to having contractures, pressure sores, nutritional problems, documentation issues, and pain management. She testified that it was thirteen days after the accident that Ms. Smith had her first skin breakdown and that at that time, she had become more immobile, which could have affected her appetite and mood. She further testified that the records failed to show that Ms. Smith was turned often enough and that the records also showed the nursing home failed to take a proactive approach to Ms. Smith's weight loss after the accident.

On August 23, 1999, Ms. Smith was diagnosed with a urinary tract infection that went untreated until September 3, 1999. In addition, Ms. Smith was not provided with the range-of-motion therapy that would have prevented the contractures. On

March 21, 2000, she was admitted to the hospital, and when admitted, it was documented that she suffered from contractures. She died on March 26, 2000.

The Estate's medical expert, Dr. Jonathan Evans, testified that it was his opinion that she died of an infection from sepsis, which was also the cause of death listed on the death summary from the hospital. The death certificate, however, listed the cause of death as end-stage coronary artery disease. Dr. Evans opined that the sepsis stemmed from an infection of a bedsore on Ms. Smith's right hip, and he attributed her death, in part, to the fracture that she suffered the previous August.

On February 22, 2002, Mary Hughes, as executrix of the Estate, filed a complaint against Health Facilities Management and Little Rock Healthcare. Ms. Hughes stated that Ms. Smith was a resident of the nursing home from January 27, 1997, until March 21, 2000. The suit alleged four counts against the defendants: negligence, negligence as defined by the Arkansas Medical Malpractice Act, violations of the Arkansas Long-Term Care Resident's Rights Statute, and wrongful death. The Estate prayed for compensatory damages and punitive damages.

On January 20, 2003, Health Facilities Management filed a motion for summary judgment with regard to all resident's-rights claims and all medical-malpractice claims. In it, it claimed that the resident's-rights statute created a cause of action only against a "licensee" of the facility. Health Facilities Management asserted that because it had never been a licensee for the facility, all claims against it based on the resident's-rights statute should be dismissed as a matter of law. It further stated that any medical-malpractice claim against it should also be dismissed as Health Facilities Management was not a medical provider. The summary-judgment motion was denied by the circuit court during the course of the trial.

On April 13, 2004, Health Facilities Management and Little Rock Healthcare filed a motion *in limine* regarding the ownership of the two companies. The motion asserted that one hundred percent of the stock of both companies was owned by a single entity, Circle B Trust. The movants stated that they anticipated that the Estate would attempt to introduce evidence of the ownership at trial and question the financial involvement of the Bedell family in the ownership of the nursing home. The circuit court orally granted the motion for purposes of the compensatory-damages phase, subject to the defendants' "opening of the door."

Following a one-week jury trial in April 2004, the jury found negligence on the part of Little Rock Healthcare with damages assessed in the amount of $38,000, and violation of the resident's-rights statute on the part of both defendants, with damages assessed against Health Facilities Management in the amount of $1.25 million and damages assessed against Little Rock Healthcare in the amount of $700,000.[1] Defendants' verdicts were found for the other causes of action. Judgment was entered which provided that interest in the amount of 10% would accrue on these awards as to both defendants.

Health Facilities Management and Little Rock Healthcare filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial or remittitur, and also for amendment of the judgment. On July 8, 2004, Health Facilities Management and Little Rock Healthcare filed their notice of appeal. On July 27, 2004, the circuit court entered its order granting the defendants' motion for amendment of the interest on the judgment to 7%. In that order, the court also denied the defendants' motion for judgment notwithstanding the verdict and, in the alternative, motion for new trial or remittitur.[2]

## I. Licensee

Health Facilities Management first urges that under the clear language of Arkansas Code Annotated § 20-10-1209 (Repl. 2000), only a licensee of a nursing home may be sued for violation of a resident's rights. It asserts that the license issued by the State of Arkansas for operation of the nursing home where Ms. Smith resided was issued to Little Rock Healthcare, and, thus, it is the only proper defendant for this cause of action. It claims that despite the circuit court's finding that Health Facilities Management was a "de facto" licensee, neither the circuit court nor this court has the authority to fashion a cause of action against Health Facilities Management under the statute. Because Health Facilities Management was not the licensee, it contends, the jury's verdict against it for violation of Ms. Smith's resident's rights must be reversed.

The Estate responds that Health Facilities Management is a licensee under the resident's-rights statute under the facts estab-

---

[1] The $38,000 damage award for negligence against Little Rock Healthcare was not appealed.

[2] While the order denying the posttrial motion was filed July 27, 2004, the motion was deemed denied on June 25, 2004. *See* Ark. R. App. P.–Civ. 4(b)(1).

lished in this case. It contends that while the code does not define "licensee" as used by § 20-10-1209, the term is capable of consistent and sensible definition by reading it in conjunction with other statutory language. The Estate asserts that any group "establishing, conducting, managing, or operating" a long-term care facility is a "de facto" licensee. It further maintains that because Health Facilities Management entered into a management contract with Little Rock Healthcare, it was responsible for the daily operation and management of the nursing facility. The Estate avers that the General Assembly intended to allow residents to sue and/or recover damages from entities that operate, establish, conduct, or manage nursing homes in such a manner that the resident's rights are deprived and that any other interpretation would defeat legislative intent. The Estate finally contends that common sense mandates that the circuit court be affirmed in that Health Facilities Management is either a licensee in fact, or has committed numerous criminal acts in managing the Little Rock Healthcare facility without a license, and, thus, should be held accountable.[3]

Our standard of review for issues involving the interpretation of a statute is *de novo* on appeal. *See Wal-Mart Stores, Inc. v. P.O. Market, Inc.*, 347 Ark. 651, 66 S.W.3d 620 (2002). The first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *See id.* When the language of a statute is plain and unambiguous, there is no need to resort to rules of statutory construction. *See id.*

Our Long-Term Care Facilities Code provides in pertinent part: "(a)(1) Any resident who is injured by a deprivation or infringement of his or her rights as specified in this subchapter may bring a cause of action against any licensee responsible for the deprivation or infringement." Ark. Code Ann. § 20-10-1209(a)(1) (Repl. 2000). The Code further provides that a license is required to operate a long-term care facility: "(a) No long-term care facility or related institution shall be established, conducted, or maintained in this state without obtaining a license." Ark. Code Ann. § 20-10-224(a) (Repl. 2000).

---

[3] The Estate made several other arguments at oral argument before this court, including strict liability, agency, and *respondeat superior*, none of which appear to have been preserved at the circuit court level for our review.

"Long-term care facility," as used in § 20-10-224, is defined as "any building, structure, agency, institution, or other place for the reception, accommodation, board, care, or treatment of three (3) or more unrelated individuals who, because of age, illness, blindness, disease, or physical or mental infirmity, are unable to sufficiently or properly care for themselves and where for that reception, accommodation, board, care, or treatment a charge is made." Ark. Code Ann. § 20-10-213(4)(A) (Repl. 2000).[4] "Licensee" is defined by *Black's Law Dictionary* as "[o]ne to whom a license is granted." *Black's Law Dictionary* (8th ed. 2004). No license was issued to Health Facilities Management. The license was issued by the Arkansas Department of Human Services to "Little Rock Healthcare #1, Inc. Doing Business As Little Rock Healthcare & Rehab Center." Thus, under the plain language of the statute, Health Facilities Management is not a licensee subject to suit for violation of a resident's rights.

A review of the referenced statutes, including § 20-10-224(a), clearly confirms that the General Assembly intended the facility itself, the one actually providing care, and not the manager of the facility, be licensed in accordance with the statutes. We give little credence to the Estate's argument that Health Facilities Management was a "de facto" licensee. There is no mention in the statutory scheme of a "de facto" licensee; thus, we conclude that it was not contemplated by the General Assembly. The mere fact that Health Facilities Management manages Little Rock Healthcare pursuant to contract does not change the plain language of the statute. Nor does the Estate cite to any convincing authority for its proposition of de facto status. Its sole citation is to *State Dep't of Pub. Welfare v. Bland*, 66 So. 2d 59 (Fla. 1953), which (1) is not authority for the interpretation of our statutes, and (2) is inapposite due to distinguishing facts. In *Bland*, no license had been issued for the daycare facility at all, and the court concluded that the operator of the facility could not avoid liability by simply not obtaining a license. In the instant case, a license had been issued by the State to Little Rock Healthcare.

---

[4] Section 20-10-213(4) was amended in 2001 and 2005 by Act 91 of 2001, § 1; Act 465 of 2001, § 1; and Act 2191 of 2005, § 4. Section 20-10-224 was amended by Act 656 of 2005, § 1. The quoted language in this opinion was that in effect at the time the allegations in the complaint took place.

We reverse the judgment against Health Facilities Management. With respect to the remaining issues, they will relate only to Little Rock Healthcare.

## II. Other Jury Verdicts

Little Rock Healthcare next argues that the jury's verdicts in its favor for the Estate's other causes of action (medical malpractice and wrongful death) exonerate it from any wrongdoing. For this reason, it contends that the circuit court erred in denying its motion for judgment notwithstanding the verdict for violation of the resident's-rights statute. It further contends that there is no evidence, separate and apart from that which formed the basis of the Estate's other causes of action, that proved a violation of Ms. Smith's rights as a resident.

When it compares the jury's instructions for the various causes of action, Little Rock Healthcare concludes that because the jury was instructed that any element of damage considered by it in answering one special interrogatory should not be considered in answering any other interrogatory, the amount awarded for violation of Ms. Smith's resident's rights must be for elements not included in any of the other causes of action. It claims that the only element not so included was the right to be treated courteously and that there was no evidence of any uncourteous treatment. It finally asserts that there is no evidence that Ms. Smith suffered actual damages as a result of any wrongful conduct that was not incorporated in the jury instructions for the Estate's causes of action for ordinary negligence and medical malpractice. It maintains that based on the circuit court's instructions, the jury was required to consider all of Ms. Smith's physical injuries when determining liability for the Estate's claims of ordinary negligence and medical malpractice. It urges that actual damages under the resident's-rights statute do not include compensation for mental suffering without a physical injury.

This court recently clarified the appellate standard of review for the denial of a motion for directed verdict or a motion for judgment notwithstanding the verdict:

> A trial court is to evaluate a motion for directed verdict or a motion for judgment notwithstanding the verdict by deciding whether the evidence is sufficient for the case to be submitted to the jury; that is, whether the case constitutes a *prima facie* case for relief. In making that evaluation, the trial court does not weigh the evidence; rather,

the trial court is to view the evidence in a light most favorable to the party opposing the motion. . . . On appeal from the denial of any of these motions, the appellate court affirms the verdict if it is supported by substantial evidence.

*Wal-Mart Stores, Inc. v. Tucker*, 353 Ark. 730, 739, 120 S.W.3d 61, 66-67 (2003) (internal citations omitted).

We conclude that this point is governed by our recent decision in *Koch v. Northport Health Servs. of Arkansas*, 361 Ark. 192, 205 S.W.3d 754 (2005). In *Koch*, the appellant argued that the circuit court erred in entering judgment for the defense on an ordinary-negligence claim based on the jury's rejection of the appellant's resident's-rights claim. The appellant contended that the circuit court could not apply the answers from the resident's-rights interrogatory to the ordinary-negligence claim, because the two claims were separate claims. This court agreed and reversed and remanded the matter for further proceedings. In reaching that conclusion, we relied on previous case law and said:

> It does not follow, however, that because two separate and distinct causes of action are tried by the same jury that the finding of facts in one cause is binding on the jury in the other cause of action if there is a dispute in the testimony. Although there was evidence tending to show concurrent negligence on the part of Graham and appellee and no negligence on the part of deceased, yet there was evidence tending to show no negligence on the part of appellee, and the jury was at liberty to so find in the cause of action on behalf of appellant for the benefit of herself and son, as much so as if the two causes of action had been tried separately instead of together. Notwithstanding the causes of action may be tried together under the provisions of the statute, they are wholly independent of each other, and the finding of the jury in one is not binding upon the jury in the other if the facts are in dispute as they were in this case.

*Koch v. Northport Health Servs. of Arkansas*, 361 Ark. at 202, 205 S.W.3d at 762 (quoting *Leech v. Missouri Pac. R. Co.*, 189 Ark. 161, 71 S.W.2d 467 (1934)).

In short, this court observed in *Koch* that there were two separate claims involved, one for ordinary negligence and the other a statutory claim, and the jury reached a different conclusion on the facts for the resident's-rights claim and the ordinary-negligence claim. We held that because the resident's-rights claim

was a statutory claim separate and apart from the common-law claim of ordinary negligence, the jury was entitled to reach conflicting results in relation to those claims. For that reason, the circuit court erred in entering judgment for the defendant on the ordinary-negligence claim.

The same holds true in the instant case and requires this court to reject the argument of Little Rock Healthcare on this issue. Merely because the jury found Little Rock Healthcare negligent and not liable for medical malpractice and wrongful death does not preclude a finding by the jury that it violated Ms. Smith's resident's rights. The common-law action for negligence was separate from the statutory claim and, based on the evidence presented to it, the jury was entitled to find as it did.

As already indicated, Little Rock Healthcare further asserts that Ms. Smith suffered no actual damages in relation to the resident's-rights cause of action. It continues its assertion that because any physical injury was already considered by the jury in conjunction with the ordinary-negligence and medical-malpractice claims, there was no physical injury, and, therefore, no mental anguish suffered by Ms. Smith that would have resulted in actual damages.

But, again, irrespective of whether the injuries suffered by Ms. Smith were considered in relation to the other claims, the resident's-rights claim was separate and distinct. Hence, consideration of the injuries resulting from the van accident, any weight loss, pressure sores, and contractures, as well as the other injuries testified to by the witnesses, such as the urinary tract infection, was proper when the jury was considering the Estate's resident's-rights claim. As a consequence, there were injuries upon which the jury could have found mental anguish, resulting in actual damages. There was clearly substantial evidence to support the jury's verdicts, and, thus, the circuit court did not err in denying the motion for judgment notwithstanding the verdict on this basis.

### III.  Motion in Limine

Little Rock Healthcare next argues that the Estate's counsel was erroneously allowed to make reference to the salary of Don Bedell and his son, Brad, who owned Circle B Trust, which owned Little Rock Healthcare, despite the circuit court's oral grant of the defendants' motion *in limine*. It claims that the Estate's

counsel had no good-faith basis for its questioning and was reading from a report, which listed the salaries paid to all officers of Little Rock Healthcare. It contends that once "the bell was rung," no instruction given could have cured the prejudice that resulted. It submits that the award of damages for violation of Ms. Smith's resident's rights as against Health Facilities Management, $1,250,000, was suspiciously close to the erroneously made reference to the Bedells' salaries.

The Estate responds in its brief and in oral argument that this argument should be rejected for three reasons: (1) the oral order *in limine* should not have been granted in the first place and was not clear regarding its parameters, and, thus, Little Rock Healthcare cannot now claim prejudice; (2) even if the ruling was correct, once the defendants relied on Little Rock Healthcare's operating loss as a defense, they opened the door, and it was appropriate to point out the salaries paid to the Bedells in connection with the funds available for operation; and (3) assuming the evidence was properly excluded, the circuit court acted within its discretion in strongly admonishing the jury to disregard the inquiry and thereby cured any possible prejudice. The Estate further asserts that the admonishment, rather than prejudicing the defendants, served to call the Estate's counsel's reliability into question.

This court has often noted that a mistrial declaration is a drastic and extreme remedy that should be granted only when there has been error so prejudicial that justice cannot be served by continuing the trial or when the fundamental fairness of the trial itself has been manifestly affected. *See, e.g., Union Pac. R.R. Co. v. Barber*, 356 Ark. 268, 149 S.W.3d 325 (2004). The circuit court is given wide latitude to determine whether a mistrial is warranted. *See id.* It further has wide discretion in granting or denying a motion for mistrial, and that decision will not be disturbed on appeal absent an abuse of discretion or manifest prejudice to the movant. *See id.*

We begin by quoting the relevant colloquy at the pretrial hearing which led to the circuit court's oral grant of the motion *in limine*:

> DEFENSE COUNSEL: Okay. We have two defendants, as we have been discussing in relation to our other motion — Health Facilities Management Corporation and Little Rock Healthcare #1. Little Rock Healthcare is the licensee. Health Facilities Management provides administrative consulting services.

Both of those defendants are owned by an entity called Circle B Trust and I can't tell the court the details of all of that and it's not in evidence as far as the trust. Essentially the ownership associated with the trust goes to the Bedell family, and there is a Mr. Don Bedell, who is the father, who is essentially retired at this point and has some health problems and Brad Bedell, who is the son, who has sort of stepped into his shoes.

The ownership of the, both of the defendants, that it is common and that it is the Bedell family — I mean Mr. Reddick has — I anticipate that the plaintiffs will want to make a lot out of this. Both people on the same, you know — and these people are getting rich off of the backs of the nursing home residents, et cetera. That is totally improper.

The Bedell family, Circle B Trust, are not defendants here. What we're here about is the care and supposedly the management — I still question whether there is going to be any actually enough evidence to get to a jury on that issue. But we have referred the court to a case that makes it clear that the financial condition, the status of an owner that's not a defendant is reversible error. And that is HCA, Health Services of the Midwest, First National Bank of Commerce involving Doctors Hospital, and the plaintiffs counsel in that case made a big deal about Doctors Hospital being owned by this other company that had a lot of money and they got up in closing argument and said, you know, they have all this money and there are these poor babies that they won't pay enough to have a — enough nurses in the nursery and this poor baby got brain damaged because there was not enough nurses there and not because of the defendant but because of the company that owned the defendant. And they got a multi-million dollar verdict, and it was reversed because of that closing argument because that company was not a defendant in the case. And significantly and to show how much that kind of argument can prejudice a jury is that when that case was retried, it was a defense verdict.

So it is clearly improper, unfair to talk about the ownership of these companies and — that they're

owned by the same company in this family is totally irrelevant to what those, the people who work for those companies were doing in relation to this nursing home and in relation to the issues in the case. And the plaintiffs ought not to be allowed to do that, and we're moving in limine in that regard.

THE COURT: Response?

PLAINTIFF'S COUNSEL: Judge, I think we can stipulate on — the plaintiff's [sic] don't, are not going to seek to introduce financial information or evidence of this trust in the compensatory phase at all. And secondly, the — I think the trust owns the stock of both defendant corporations, and if that becomes an issue, I don't have any — first of all, I don't have any financial records on this trust. It may be an issue in the punitive phase, and we can take that up before we present any evidence. I don't think that's an issue.

As far as mentioning who they are, well, I do — I guess I do take issue with that because I think the jury should be allowed to know who these companies are. I mean, they're all the same company, all the same ownership. But as far as us making an issue out of the trust, we are not going to. That's not a central focus of the case. I just read the motion before I came over and I am not real clear what she is asking for, but I agree we're not going to use any financial records from the trust. We don't have any records from the trust for that matter.

THE COURT: I think the request is not only that, but not to mention the fact that there was common ownership or —

PLAINTIFF'S COUNSEL: You know in the compensatory phase, I would agree not to mention the trust. I think where it becomes an issue is in the punitive phase where we're trying to separate out these assets, and I am speculating because I have no records. But if we learn that the Bedell — Circle B Trust owns both assets, 100 percent of the stock of both defendants, then it may be necessary to get into some of those records to deter-

mine the net worth. And that's an issue we can take up at the time or after we have made a prima facie case.

Does that adequately address counsel's issue?

THE COURT: I'll grant that as far as the compensatory. I will address it in punitive damages. Of course, everything is obviously subject that if the defendants open up the door, then —

It does not appear that during the course of the trial, mention was ever made of the Circle B Trust. However, multiple references were made to the Bedell family's ownership of both companies during the testimony of William Mitchell, who was called as a witness by the Estate and who was employed by Health Facilities Management from 1996 to 2000. There was no objection to his testimony made by the defendants during his direct examination, much less a motion for mistrial. For example, during the direct examination, he testified that the Board of Directors for Health Facilities Management was composed of Don Bedell, Brad Bedell, and others, and that, at that time, the Board of Directors for Little Rock Healthcare consisted of the same people as Health Facilities Management. No objection was made. He then testified that when it came to dealing with administrative matters, the primary stockholders of the company, Don Bedell and his son Brad, would do that. Again, no objection was made. He next testified that the Bedells were the primary stockholders of Health Facilities Management as well as the primary stockholders of Little Rock Healthcare. No objection was made.

Mr. Mitchell, in continuing his testimony on direct examination, testified that, from 1996 to 2000, 100% of the stock of Little Rock Healthcare was owned by Don Bedell. He added that the 100% shareholder of Heartland Leasing Personnel, who was responsible for Little Rock Healthcare's administrator, Dan Yancey, was Don Bedell. No objection was made to this testimony.

On cross-examination by defense counsel, Mr. Mitchell referred to the fact that Don Bedell owned Health Facilities Management and owned the stock of Little Rock Healthcare. He further testified that despite the provision for a management fee of 7% in the management contract between the defendants, Health Facilities Management could not make a profit off the contractual relationship because of Arkansas regulations. With respect to Little

Rock Healthcare, Mr. Mitchell testified that it had not operated at a profit since it was acquired in 1996.

On redirect examination, the Estate's counsel, while reviewing Medicaid cost reports, questioned whether Mr. Mitchell was aware that the Bedells' salaries were over $1.2 million. At that point, defense counsel objected and moved for a mistrial. The circuit court ruled that the question violated the motion *in limine* and the court's oral order. The court then proposed a limiting instruction in which the jury would be told to disregard the testimony. It gave the following instruction:

> All right. Ladies and gentlemen, I am going to read an instruction to you, a limiting instruction to you, and you need to follow this instruction.
>
> Okay. You are to disregard the last question asked by the plaintiff's attorney concerning the income of the Bedells. The Bedells are not parties to this case, so their personal income is not relevant and is not to be considered by you. Any reference made concerning the Bedells' salary is in violation of a previous order of this court, and in no circumstance is it appropriate for you to consider this question. I am specifically instructing you that the testimony in the case does not and would not support any finding that the Bedells received a salary. I stress to you the importance of following this instruction and, in excluding any reference or inference from your minds as it is necessary to ensure that the parties receive a fair trial.

We cannot say that the circuit court abused its discretion in denying the defendants' motion for a mistrial and by admonishing the jury. First, it is somewhat unclear that the confines of the motion *in limine* included the "objectionable" testimony, which was evidence of the Bedells' salaries, not their net worth.

The circuit court based its order on the arguments made by defense counsel as it related to this court's decision in *HCA Health Servs. of Midwest, Inc. v. National Bank of Commerce*, 294 Ark. 525, 745 S.W.2d 120 (1988). In that case, this court reversed and remanded based on an improper argument made during closing arguments. Plaintiff's counsel had referred to the hospital's parent company, which was not a defendant in the case, as a for-profit corporation that should bear much of the responsibility for the injuries that were the subject of the action. This court observed:

> While HCA was never made a party-defendant in this case, appellees' strategy, at least in part, was to emphasize HCA's size and

wealth, as well as its connection to HCA Health Services Midwest, Inc, when asking the jury to assess punitive damages against the appellant. Because HCA Health Services Midwest, Inc. was the sole party-defendant here, not HCA, and no reason was shown why their separate identities should be disregarded, we must conclude the trial court erred in permitting appellees to refer to HCA in their quest for punitive damages.

294 Ark. at 531-32, 745 S.W.2d at 124.

The instant case is clearly distinguishable. First, the Bedells were officers and owners of a company that *was* a defendant in the case. Thus, the situation present in HCA does not pertain. In addition, the reference to the Bedells' salaries was just that — a reference to their salaries associated with the nursing home — not a reference to the Bedells' personal wealth, which was the basis of the motion *in limine* and the resulting order.

Secondly, there were numerous references to the Bedells' ownership of both companies, which were made during the course of Mr. Mitchell's testimony without objection by the defendants. This court has previously held that where a motion *in limine* on an issue was granted, it was the appellant's burden to obtain a ruling on the motion when it appeared that the circuit court's previous ruling was being violated. *See, e.g., Anderson v. State*, 357 Ark. 180, 163 S.W.3d 333 (2004). This was not done on the joint-ownership issue, which was part of the motion *in limine*.

In addition, we agree that the defendants "opened the door" when they brought out the fact that the facility was not operating at a profit. Health Facilities Management was able to pay large salaries to its employees, which included the Bedells and others. Certainly that seems relevant in response to the owners' solicitation of testimony that the facility has been unable to yield a profit in four years.

Counsel for Little Rock Healthcare argues vigorously that the Estate's counsel should have approached the bench at trial for a sidebar conference rather than immediately violating the court's order. To be sure, that is the better practice that should be followed when an order *in limine* is at issue. In this case, however, the oral order *in limine* before trial advised counsel that it was in effect subject to defense counsel "opening the door." It is not unreasonable to conclude, as the Estate's counsel obviously did, that once the door was open regarding the facility's loss of money, the circuit court had allowed him to delve into the Bedells' salaries.

Finally, the admonition by the circuit court to the jury to disregard the question regarding the salaries of the Bedells was clear, precise, and strong.

In sum, the lack of clarity in the scope of the order *in limine*, the circuit court's proviso regarding opening the door, and the strong admonition of the circuit judge lead this court to conclude that the circuit court did not abuse its discretion in refusing to grant a mistrial.

### IV. Remittitur

Little Rock Healthcare next claims that because the jury found no damages as a result of wrongful death or medical malpractice and due to the lack of evidence of any pain and suffering on Ms. Smith's part unrelated to those claims, the jury's verdict for $700,000 was clearly excessive. It contends that the verdict was the result of prejudice and, thus, should this court determine that reversal of the verdict and dismissal of the case is not warranted, a substantial remittitur of the verdict is appropriate.

In *Advocat, Inc. v. Sauer*, 353 Ark. 29, 111 S.W.3d 346 (2003), this court reiterated its standard of review of a claim for remittitur:

> We, initially, are of the opinion that the Sauer Estate correctly states our standard of review. Where an award of damages is alleged to be excessive, this court reviews the proof and all reasonable inferences most favorably to the appellee and determines whether the verdict is so great as to shock the conscience of the court or demonstrate passion or prejudice on the part of the trier of fact. *See Houston v. Knoedl*, 329 Ark. 91, 947 S.W.2d 745 (1997). Remittitur is appropriate when the compensatory damages awarded are excessive and cannot be sustained by the evidence. *See Ellis v. Price*, 337 Ark. 542, 990 S.W.2d 543 (1999). The standard of review in such a case is that appropriate for a new trial motion, *i.e.*, whether there is substantial evidence to support the verdict. *See Johnson v. Gilliland*, 320 Ark. 1, 896 S.W.2d 856 (1995) (citing Ark. R. Civ. P. 59(a)(5) (stating a new trial may be granted on the ground that there was error in the assessment of the amount of recovery, whether too large or too small)). Moreover, Arkansas Rule of Civil Procedure 59(a)(4) provides as one ground for a new trial "excessive damages appearing to have been given under the influence of passion or prejudice."

353 Ark. at 43, 111 S.W.3d at 353.

In the instant case, there was ample evidence that Ms. Smith was not treated in accordance with her resident's rights. There was testimony that her needs could not be met all the time. She was sometimes found lying in urine for extended periods of time. As a result of not being properly belted into her wheelchair, she suffered a fractured tibia when she was almost in a van accident. She further suffered a urinary tract infection and developed pressure sores and sepsis. In addition, she developed contractures due to the home's failure to provide range-of-motion exercises. We conclude that the jury's verdict was not the result of passion or prejudice.

The question then becomes, does the verdict shock the conscience of the court? We hold that it does not. Our Long-Term Care Facilities Code provides that a resident of a long-term care facility should be assured:

> The right to receive adequate and appropriate health care and protective and support services, including social services, mental health services, if available, planned recreational activities, and therapeutic and rehabilitative services consistent with the resident care plan, with established and recognized practice standards within the community, and with rules as adopted by the agency[.]

Ark. Code Ann. § 20-10-1204(8) (Repl. 2000). Section 20-10-1204 further provided Ms. Smith with:

> The right to be treated courteously, fairly, and with the fullest measure of dignity and to receive a written statement and an oral explanation of the services provided by the licensee, including those required to be offered on an as-needed basis.

Ark. Code Ann. § 20-10-1204(21) (Repl. 2000).

In the case at hand, Ms. Smith suffered from multiple lapses in care, and, further, she was denied her dignity as well. Clearly, the injuries she suffered due to the staffing and supply issues, which were present at Little Rock Healthcare, resulted in a violation of the resident's-rights statute, and, as a result, actual damages were properly awarded to the Estate. Under these facts, we cannot say that a verdict of $700,000 requires a remittitur.

### V. 7% Interest

Little Rock Healthcare claims, as its final point, that due to the fact the Estate never filed an amended judgment to reflect the circuit court's reduction of the rate of postjudgment interest to 7%,

it requests that should the jury's verdicts not be dismissed, any judgment should reflect a postjudgment interest rate of 7%.

Little Rock Healthcare is correct. Here, the circuit court entered an order, following the defendants' posttrial motion, granting a reduction in the interest rate from 10% to 7%. Accordingly, when an amended judgment is entered reflecting this opinion, a 7% interest accrual should be included.

Affirmed in part. Reversed in part and remanded.